Billy Lee JOHNSON, Petitioner-Appellant.

v.

W. J. ESTELLE, Director, Texas Department of Corrections, Respondent-Appellee.

No. 73–3945.

United States Court of Appeals, Fifth Circuit.

Jan. 9, 1975.

Harry H. Walsh, Huntsville, Tex., for petitioner-appellant.

Robert C. Flowers, Dunklin Sullivan, Asst. Attys. Gen., Gilbert Pena, Austin, Tex., for respondent-appellee.

Before GOLDBERG, GODBOLD and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This case presents a good illustration of the perils of double jeopardy. On May 23, 1967 Billy Lee Johnson was found not guilty of the crime of "burglary of a private residence at nightime with intent to commit rape." Five months later he was convicted of "assault with intent to commit rape," on charges stemming from the same incident for which he was acquitted in his first trial. He was sentenced to 99 years in jail.

His conviction was upheld on direct appeal, Johnson v. State, Tex.Cr.App. 1968, 432 S.W.2d 98, and his subsequent petitions for a writ of habeas corpus were denied in State and federal district courts. He appeals to this Court for his writ. Today we find that the issues presented in the second trial substantially duplicated those presented in the first trial. We cannot conclude that a rational jury would have acquitted or convicted defendant on the basis of the differences between the proof necessary to substantiate each indictment.

Unfortunately, our knowledge of the facts and the legal issues presented to the jury in the first case is limited. This Court was advised, after it had received no transcript from the first proceeding, "that no further transcripts are available in the above-styled cause". Letter to the Court, Sept. 25, 1974, from District Court for Northern District of Texas. Our knowledge of the testimony at the first trial is limited to stipulations between defense attorney and prosecutor about the testimony of the prosecuting witness and the police officer who conducted the initial investigation.

Those stipulations are:

"That if the witness, Mrs. Corah Bell Crandell, were present in Court, she would testify that on May 22, 1967 in the Criminal Court Room Number Five of Dallas County, Texas that she appeared as a witness in Cause Number 67–1034–JL, styled State of Texas Vs. Billy Lee Johnson, which said case was a case charging Billy Lee Johnson with burglary of a private residence at nighttime with intent to commit rape, and after being sworn as a witness in that case, she testified on direct examination that she was eighty-two (82) years of age, that she lived then at the time she testified at 1403 South Fitzhugh, and had lived there for forty (40) years; that on February 4, 1967, she was living there and she had lived and resided in a residence there in a house which had four (4) walls, a ceiling, floor, doors and windows; that about 9:45 that evening she was at home at that location at 1403 South Fitzhugh, and she was watching television when she heard someone at the back side of the house; that she went to the door and saw a man there who said that he wanted to see about buying a car that she had for sale. She testified that she told him that she did not have any car for sale. She identified the man as being a colored man, a member of the Negro race. She testified that colored people lived around her. She testified that she went back in to where the T.V. was, and the next thing she knew the man appeared, or a man appeared and had a knife and grabbed her by the shoulders. She ran for the phone and tried to call the police or dial the operator, and he grabbed her by the shoulders, dragged her all over the house, turned off the T.V., tore off her dress, threw her down on the front of the couch and was trying to assault her; that she was thrown to the floor, her clothes were torn; that he said that, "I am going to assault you and kill you and take all your money". He also said that he was going to rape her. About that time she testified there was a

bright light thrown on the house and that she screamed, "O God, he is going to kill me", and she resisted him as best she could; that he was trying to have intercourse with her without her consent; that she was a female person, a woman; that his assault on her and his attempts to have carnal knowledge and intercourse with her was without her consent and against her will; that she could not identify the man who was in the house, who was committing the assault upon her. On cross examination she testified that she had the clothing that she had worn at the time of the assault; that the police came out and investigated the case".

The stipulated testimony of the police officer was:

"If Officer W. T. Mikel were present in court and sworn as a witness, he would testify that he is a member of the Dallas Police Department assigned to the Radio Patrol Division with particular specialty of the Canine Corps, and he worked in that capacity on February 4 and 5, 1967 when, with a police dog named Rex, at about 9:45 p. m., he was near 1403 South Fitzhugh and heard a woman scream. He could not determine where the screams were coming from, but he did stop his police car and got out and determined that the screams were coming from the house at 1403 South Fitzhugh. He could hear a woman screaming, "Help, you are killing me," or words to that effect. He testified that he went to the front door of the house and that he was let in by a woman whom he identified as Mrs. Corah Bell Crandell; that her clothes were torn; that she said something to the effect, "He is going out the back door", and he ran around to the back door and saw a man whom he identified in court as the Defendant coming out the back door or on the back porch of Mrs. Crandell's house; that he hollered for him to stop; that thereafter he shot him two or three times and the Defendant was badly wounded and he

remained there at the scene until he was removed by the ambulance".

We also have a transcript of the instruction which the judge gave the jury in this first case. We will refer to it below as it elucidates particular points.

## I.

In Benton v. Maryland, 1969, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707, the Supreme Court held that the Fifth Amendment guarantee against double jeopardy was enforcible against the states through the Fourteenth Amendment. The following term, the Court held that collateral estoppel is part of the Fifth Amendment double jeopardy prohibition. Ashe v. Swenson, 1970, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469. "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. The Court in *Ashe* went on to say that where the jury in the first trial had returned a general verdict, a court reviewing for duplication of issues must:

[E]xamine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

397 U.S. at 444, 90 S.Ct. at 1194, 23 L.Ed.2d at 475–476, *quoting* Mayers & Yarborough, Bis Vexari: New Trials and Successive Prosecutions, 1960, 74 Harv.L. Rev. 1, 38–39.

Ashe was acquitted in his first trial of robbery of one of the players in a poker game. He was then tried and convicted for robbing another player in the game. Since the only controverted issue in each trial was the identity of the robber, the Court held that the second trial, by requiring relitigation, had put the defendant in double jeopardy.

As noted by the United States Magistrate in the present case, there are two

issues upon which the jury in the first trial could have based its acquittal, which were controverted in the second trial. One was the identity of Mrs. Crandall's assailant and the other was the intention of that assailant to commit rape. The State argues that *Ashe* applies only where one issue is in question in both trials.

■■■ We disagree with the State. Application of the rule depends upon whether some issue necessary for the prosecution's case in the second trial has necessarily been found for the defendant in the first trial. *See* Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180. Thus the fact that either identity or intent could have been the basis for the first jury's decision does not foreclose the application of Ashe v. Swenson, because *both* factors would have to be proven in order to convict at the second trial. Where a determination of innocence on one of two issues was the cause of an acquittal and a determination of guilt on *both* issues is necessary for a subsequent conviction, the State is estopped from bringing the action.

## II.

■■■ The State contends, however, that a "rational jury" could have based its decision in the first trial on the State's failure to establish essential elements not in controversy in the second trial. If this is in fact the case, then the double jeopardy criterion would, of course, not apply.

In the present case we find that no rational jury could have acquitted on the

basis of the different "issues" presented in the first trial, absent a defendant's reliance on those factors.[1] The State cannot produce a record here showing such reliance.[2] The State's suggested bases for acquittal in the first trial are nothing more than the sheerest speculation.

There are three components of a "burglary of a private residence at nighttime with intent to commit rape" charge which are not involved in an "assault with intent to commit rape" charge and upon which the State believes the jury in the first trial could have based its verdict of acquittal. They are: "[(1)] the Petitioner entered the house without breaking; (2) that he entered by breaking with intent to commit theft but that the intent to commit rape was later formed; (3) that there was insufficient evidence that the site of the alleged crime was a private residence." Appellee's Brief at 6.

We address ourselves to each issue, in order. 1) Petitioner entered without breaking.

That this is an improbable jury rationale is evident from the trial court's jury instruction in the first trial:

By the term "entry" into a house is meant every kind of entry but one made by free consent of the occupant, or of one authorized to give such consent.

By the term breaking is meant that the entry must be made with actual force. The slightest force, however, is sufficient to constitute breaking, such as lifting a latch of a door that is shut or pulling or pushing open a door.[3]

---

1. We keep in mind the warning given in the same article that the Supreme Court quoted from in *Ashe:*

It is probable that in the large majority of criminal prosecutions the defendant will litigate only one issue. For example, he will present an alibi, plead a lack of requisite criminal intent, or deny that the act was perpetrated at all. If a latter court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the

defendant did not contest, the possible multiplicity of prosecutions is staggering.
Mayers & Yarbrough, 74 Harv.L.Rev. at 37–38.

2. There is no suggestion that the lack of a record owes in any way to the fault of petitioner Johnson or his counsel, so we need not consider whether showing of such fault would raise any hostile presumption.

3. Nor was there room for interpretation of the meaning of "breaking" by defense coun-

There is no available testimony offering a scintilla of evidence that defendant might have come into the Crandall home without breaking, and the judge's charge to the jury gave an expansive definition of breaking. No rational jury could have acquitted, on the grounds that defendant did not break into the home, on the basis of what we have before us.

The State's second alternative, that the jury may have doubted that the requisite intent existed at the moment of entry, is equally implausible. With not a speck of factual foundation the State speculates that the jury may have believed that Johnson entered the Crandall house with another purpose, such as burglary, but that, upon casting his eyes on this eighty-two year old woman he was suddenly overcome with a passion which caused him to change his intention.

The judge's instruction to the jury would not alert it to a special concern over the moment when defendant formed his intention. The judge's instructions on this score were:

You are instructed that the offense of burglary of a private residence in the nighttime with intent to commit rape, is constituted by entering a house, that is, a private residence, by force, threats or fraud, at night, or in any manner by entering a private residence at any time, by either day or night, and remaining concealed therein until night, with the intent of committing the offense of rape. The charge in this case is the entry into a private residence, at night, by force, with the intent to commit rape. The punishment is by confinement in the

Texas Department of Corrections for any term of years not less than five. . . . [b]efore you would be warranted in finding a verdict of guilty, you must find from the evidence, beyond a reasonable doubt, that the entry was made in the nighttime, and with the intent to commit the crime of rape.

While the judge gave individual definitions of many of the terms in the charge he did not specifically draw attention to the proposition that the intention must be in the mind of the burglar at the time of entry.[4]

We do not believe that any rational jury, *sua sponte,* could have been moved to acquit defendant on the grounds that his intention turned from robbery to rape in midflight from the threshold to Mrs. Crandall.

Finally, the State argues that the jury could rationally have doubted that the alleged incident transpired in a "private residence." This is the most transparent of the State's speculations. In his instruction, the judge told the jury:

"Private residence," as used in the statute, means any building or room occupied and actually used at the time of the offense by any person or persons as a place of residence.[5]

Mrs. Crandall testified in her first trial "that she lived then at the time she testified at 1403 South Fitzhugh, and has lived there for forty (40) years; that on February 4, 1967, she was living there and she had lived and resided in a residence there in a house which had four (4) walls, a ceiling, floor, doors and win-

---

sel. The Texas courts have long held that opening a shut door is an entry by force which constitutes breaking. *See,* e. g., Mixon v. State, Tex.Cr.App.1966, 401 S.W.2d 806.

It is worthy of note that appellant contends in his brief, and the State does not deny, that among the items of evidence submitted in the first trial, and resubmitted in the second, was a picture of a screen door cut open.

4. Texas courts have not put the burden on the prosecutor to show the nature of the intention at the exact moment of breaking, but have upheld convictions where intention has

been read, *post hoc,* from the subsequent actions. *See* e. g., Friga v. State, Tex.Cr.App. 1973, 488 S.W.2d 430; Eagen v. State, Tex. Cr.App., 1970, 451 S.W.2d 514; Dickson v. State, Tex.Cr.App.1901, 64 S.W. 1043. So, there can be no presumption of prosecutorial failure on this issue.

5. The statute to which the judge referred is Vernon's Ann.Tex.Penal Code Art. 1391, which defines private residence as "any building or room occupied and actually used at the time of the offense by any person as a place of residence."

dows . . .;" and since Officer Mikel is stipulated to have testified that he "determined that screams were coming from *the house at 1403 South Fitzhugh*" (emphasis added), there is simply nothing to suggest that Mrs. Crandall was not in a residence and that the jury could have entertained real and rational doubts on this issue.

### III.

This Court usually finds that its supply of ingenious semantic puzzles and fantastic hypotheticals emanate from the supplications of defendants. In keeping with deeply rooted American notions of justice and Constitutional edicts, we examine these applications to see if in fact the defendant was denied due process in his trial or whether the facts presented lever the probability that he engaged in criminal activity below the "reasonable doubt" marker. But fantastic hypotheticals introduced by the State to avoid the defense of double jeopardy are subject to a different standard. We must see if a "rational jury" could have based its decision on such factors, guided by the principle enunciated in Ashe, 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475, that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." By its injunction to apply collateral estoppel with "realism and rationality" we believe that the Supreme Court means that we should not allow a second trial, merely because technical requisites of the first charge are not involved in the second, where there is no evidence suggesting that those factors were even presented to the first jury for its active consideration. In the present case the alternative grounds hypothecated by the State are not of the sort which could move a rational jury, on its own, to acquit.

We are convinced that both juries stood their decisions on identity of assailant and intent to rape and did not engage in mental gymnastics so as to land on differing components. Double jeopardy is not a semanticist's paradise, but is

to be determined by applying conventional idioms to the jurors' deliberations. There must be some legal necessity basic to one acquittal, not involved in the next trial, to justify a superseding conviction. We cannot permit initial trial deficiencies to be cured by subsequent trials. There are only four quarters to a football game. The exorcised double jeopardy is the constitutional eliminator of the might have beens. Puristic parallelism is not an absolute in the law of double jeopardy. Multitudinous criminal charges may spring from the same incident. The State's argument in the present case would nullify the doctrine of double jeopardy because any slight deviation in the indictment would give the State another Monday morning quarter.

It is therefore ordered that the petition of Billy Lee Johnson for a writ of habeas corpus is granted and that he be released from custody.