**UNITED STATES of America, Appellee,**

v.

**Larry Wayne BROWN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Larry Edward HENDRIX, Appellant.**

**Nos. 76–1335, 76–1345.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1976.

Decided Jan. 17, 1977.
Certiorari Denied March 21, 1977.
See 97 S.Ct. 1566.

*Id.* at 494, 96 S.Ct. at 3052 (footnotes

**440**

H. William Allen, Wright, Lindsey & Jennings, Little Rock, Ark., for appellant (Brown) in No. 76–1335.

Kenneth F. Stoll, Asst. U. S. Atty., Little Rock, Ark., for appellee in Nos. 76–1335 and 76–1345.

W. H. Dillahunty, U. S. Atty., Little Rock, Ark., for appellee in No. 76–1335.

Ralph C. Hamner, Jr., Little Rock, Ark., for appellant in No. 76–1345.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

WEBSTER, Circuit Judge.

Appellants Larry Wayne Brown and Larry Edward Hendrix appeal from their jury conviction on one count of conspiracy to rob the Citizens Bank of Jonesboro, Arkansas, in violation of 18 U.S.C. §§ 2113(d) and 371. Brown had previously been acquitted by a jury on a charge of perjury arising out of his testimony before the grand jury investigating the bank robbery conspiracy. The issues presented on this appeal concern primarily (1) the application of the collateral estoppel rule as a result of Brown's prior perjury acquittal and (2) the government's cross-examination of Hendrix and use of extrinsic evidence of other conduct involving Hendrix and a third conspirator, Robert Harold Hartgraves.

At the conspiracy trial, Hartgraves, who had pleaded guilty, was the government's principal witness. It was his testimony that, following a series of conversations with Hendrix, who was then a sergeant with the Jonesboro Police Department, he enlisted the assistance of two other conspirators, Jerry Jenkins and Herbert Lane, to plan the robbery of the Indian Mall Branch of the Citizens Bank. Lane produced a proposed plan of procedure, including a getaway route and method of dropping and subsequently picking up the money. Hartgraves submitted this plan to Hendrix, who made a number of important revisions. Originally, Hartgraves was to be the man to pick up the money, but Hendrix arranged with Hartgraves to be the "pickup" man himself. Then, according to the testimony of Larry Taylor, Hendrix asked appellant Brown to pick up the money. On September 11, 1974, Jenkins, Lane and Hartgraves rehearsed the approach to the bank. Jenkins and Lane, independently of each other, reported information about the conspiracy to a deputy sheriff of Craighead County, who alerted the Jonesboro police and the Federal Bureau of Investigation. Armed with this information, the police stopped Jenkins on the morning of September 12 approximately one hundred yards from the bank, wearing clothes supplied by Hartgraves. Brown was arrested a short time later, after he was observed in a parked car near the Embassy Apartments, where the money was to be picked up.

---

* The Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation.

We deal now with the separate contentions of appellants Brown and Hendrix.

## I. Brown

The principal issue raised by Brown on this appeal is whether the District Court erred in denying his several motions to dismiss and to limit the introduction of government evidence of his participation in the conspiracy on the ground that this factual issue had already been resolved by his acquittal in the perjury trial.[1]

In *Ashe v. Swenson,* 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court recognized that the collateral estoppel rule is embodied in the Fifth Amendment guarantee against double jeopardy. Collateral estoppel, as defined by the Supreme Court, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194. The Court endorsed the view that the constitutional guarantee against double jeopardy "protects a man who has been acquitted from having to 'run the gantlet' a second time." *Id.* at 446, 90 S.Ct. at 1195.

It is, of course, difficult in most cases to ascertain from a jury's general verdict exactly what facts were necessarily found as a predicate to that verdict. We are admonished by the Supreme Court, however, not to be hypertechnical but to approach the question with realism and rationality.

> [T]his approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at 444, 90 S.Ct. at 1194, *quoting* Mayers & Yarbrough, *Bis Vexari*: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 38–39 (1960).

*The pleadings.* The perjury indictment charged that Brown lied to a grand jury investigating the bank robbery conspiracy when he made the following answers to questions propounded to him under oath:

\* \* \* \* \* \*

Q. "Do you know Lt. Hendricks (sic), Jonesboro Police Department?"

A. "Yes, sir, Larry?"

\* \* \* \* \* \*

Q. "Did you all ever discuss this bank robbery."

A. "I don't know what you are talking about bank robbery."

Q. "I am talking about the attempted bank robbery up at Jonesboro."

A. "I know there was an attempt. I have no idea, information on that. They haven't told me anything about it sir. They told me there was an attempted bank robbery, they were holding me for investigation."

\* \* \* \* \* \*

Q. "I am going to ask you one more time, Mr. Brown, and warn you again if you make a false statement in here the Grand Jury could indict you for perjury."

A. "I understand that."

Q. "Penalty up to five years."

A. "I understand you, sir."

Q. "Why were you at the apartment the morning, the Embassy Apartment Complex for fifteen to twenty minutes?"

A. "I was there to see a girl. That's why I was there, sir, because I was on my way earlier that morning to go see about a police job at Trumann."

\* \* \* \* \* \*

Q. "Did you see Mr. Hendricks (sic) the day before you were arrested?"

A. "No, sir, I didn't."

Q. "And you and Mr. Hendricks (sic) never discussed this matter?"

---

1. Brown also contends it was error to deny him a transcript of the perjury trial for use at the conspiracy trial. We do not reach that issue in view of our resolution of the principal claim.

A. "No, sir."

The indictment charged that the testimony of Brown was not true "in that the defendant, LARRY WAYNE BROWN, went to the Embassy Apartments at Jonesboro, Arkansas, at the request of Larry Edward Hendricks (sic) on the morning of September 12, 1974, to pick up money that was to be obtained from a bank robbery of the Indian Mall Drive-In Branch of the Citizens Bank of Jonesboro . . . ."

*The evidence.* We have reviewed the record of the perjury trial. The government produced Larry Dale Taylor, a friend of Brown, who testified that on the evening of September 11, 1974, he was at Brown's home until early in the morning of September 12. At that time, Brown asked to borrow Taylor's car, explaining that he intended to use it to pick up the money after it was dropped off following the bank robbery. According to Taylor, Brown told him that Larry Hendrix had asked him to do this. Taylor agreed to lend him the car. Other government witnesses described the evolution of the plan to rob the Indian Mall Drive-In Branch of the Citizens Bank of Jonesboro, including three practice runs on the bank. Law officers testified how, alerted by the information received from Lane and Jenkins, they observed Brown arrive at the Embassy Apartments, circle once around the area and then park, facing out from the curb. They testified that he walked to some weeds (where the money was supposedly to be dropped) and then returned to his car, where he sat in a slumped position. Brown left the scene after about thirty minutes and was arrested at his house shortly thereafter.

Brown's testimony in defense was that he had indeed asked to borrow Taylor's car, but only because he wanted to interview a police department in another city and was having trouble with his own car. On the morning of September 12, 1974, he stopped at the Embassy Apartments to call on a woman acquaintance who had been ill. After sitting in the car and walking once down the walk, he decided not to go in and left. Brown denied walking to the weedy area. Most significantly, he denied discussing a bank robbery with Hendrix or anyone else.

*The charge.* In its charge to the jury, the District Court read the indictment, which quoted the allegedly false statements. It instructed the jury that the critical statements were material as a matter of law and left it to the jury to determine whether (1) the statements were false in one or more respects specifically charged in the indictment, (2) the defendant did not believe the statements to be true when made, and (3) the false testimony was knowingly and wilfully given as charged.

 Upon our review of the pleadings, the record, and the charge, it is clear to us that the jury could not have acquitted Brown without first determining that he did not have discussions with Hendrix about the bank robbery conspiracy. The statements attributed to Brown by Taylor do not lend themselves to an equivocal interpretation; either they were made by Brown or they were not. Brown denied that he made the statements and denied that he had gone to the Embassy Apartments for any other purpose than to see his sick friend. His testimony before the grand jury could not have been through mistake or inadvertence; the narrow question before the trial jury, realistically, was whether he had lied about his noninvolvement in the conspiracy. The jury must have believed his testimony; it could not have grounded its verdict upon any other issue. *See Ashe v. Swenson, supra,* 379 U.S. at 445, 90 S.Ct. 1189.[2]

2. It is worth noting that this is the first case to our knowledge in which the government proceeded first on a perjury charge and then, following acquittal, tried the defendant on the conspiracy which was the subject of the claimed perjurious statements. The perjury case presented a substantially more narrow fact determination and thus makes the nature of the jury's finding far more certain than it would be had the conspiracy case been tried first. In passing upon a conspiracy case, the jury must find (1) an agreement, (2) a combination of two or more persons, (3) an unlawful purpose, and (4) that at least one of the conspirators committed an overt act in furtherance of the conspiracy. *United States v. Sellaro,*

In the conspiracy prosecution, Brown asserted his collateral estoppel claim in pretrial motions. The District Court, which had presided at the perjury trial, did not have a transcript of that trial and relied instead upon its recollection of what had taken place seven months before. It was the District Court's recollection that "the real issue in the perjury case" was whether Brown went to the Embassy Apartments for the purpose he stated to the grand jury. It then said:

> There was never anything said by the government—no testimony presented in the case, in the perjury case, as to whether or not Mr. Brown and Mr. Hendrix ever entered into a discussion.

Based upon this misrecollection of the evidence,[3] the District Court attempted to safeguard Brown's double jeopardy rights by precluding discussion of any of his activities at the Embassy Apartments, but it permitted Taylor to testify that Brown told him he had agreed with Hendrix to be the "pickup" man. This was prejudicial error.

■ The only evidence before the jury in the conspiracy case which in any way connected Brown to the conspiracy was the testimony of Taylor that Brown had told him he had agreed with Hendrix to pick up the money. Clearly, that same issue of fact had been before the jury in the perjury case and must necessarily have been resolved by the jury in favor of Brown. He therefore could not be required to "run the gantlet a second time." Since the government does not contend that it could establish Brown's participation in the conspiracy by any other means on retrial, it follows that his conviction must be reversed and a judgment of acquittal entered in his favor.

## II. Hendrix

Hendrix likewise contends that collateral estoppel should have barred any evidence that he and Brown discussed plans for the bank robbery. He also asserts that it was prejudicial error to permit extrinsic evidence to be used by the government on rebuttal to impeach the credibility of defense witnesses. Finally, he contends the District Court should have granted his motion for a continuance in order to permit him to obtain the testimony of a witness

---

514 F.2d 114, 121 (8th Cir. 1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *Cross v. United States,* 392 F.2d 360, 362 (8th Cir. 1968). Failure of proof of any essential element will result in acquittal, but the variables involved will usually make it difficult to determine upon what basis a jury necessarily reached a verdict. *United States v. Tramunti,* 500 F.2d 1334, 1346 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). An acquittal in a conspiracy case would therefore not necessarily be based on the jury's belief of the defendant's testimony and hence would not normally be the basis for collateral estoppel in a *subsequent* perjury trial. *See United States v. Gugliaro,* 501 F.2d 68 (2d Cir. 1974). *See also United States v. Williams,* 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951); *Adams v. United States,* 287 F.2d 701 (5th Cir. 1961).

When the issue in the first trial was narrow, however, and acquittal necessarily resolved an essential factual issue in a subsequent trial, collateral estoppel has been applied to reverse a conviction in the subsequent trial. *See Turner v. Arkansas,* 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972); *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Johnson v. Estelle,* 506 F.2d 347 (5th Cir.), *cert. denied,* 422 U.S. 1024, 95 S.Ct. 2619, 45 L.Ed.2d 682 (1975); *McDonald v. Wainwright,* 493 F.2d 204 (5th Cir. 1974); *United States v. Nash,* 447 F.2d 1382 (4th Cir. 1971); *United States v. Kramer,* 289 F.2d 909 (2d Cir. 1961); *United States v. Simon,* 225 F.2d 260 (3d Cir. 1955); *Cosgrove v. United States,* 224 F.2d 146, 158 (9th Cir. 1955); *Erlich v. United States,* 145 F.2d 693 (5th Cir. 1944).

3. Taylor gave the following testimony on direct examination:

> Q. What did [Brown] say, sir?
> A. He told me that he was—that there was to be an attempted bank robbery, that he was to be the pickup man.
> Q. Did he say where he was going?
> A. Yes, sir.
> Q. Where is that, sir?
> A. Embassy Apartments.
> \* \* \* \* \* \*
> Q. Okay. How did he mention Larry Hendricks' (sic) name in this conversation, sir?
> A. He said that Larry Hendricks (sic) had asked him to go pick up the money.
> Q. At the Embassy Apartments?
> A. Yes, sir.

needed to answer the government's extrinsic evidence.

### A.

While we hold that Brown's acquittal in the perjury trial precludes the use against him in the conspiracy trial of evidence of his alleged conspiratorial conversations with Hendrix, it does not follow that Hendrix, who was not a party to the perjury trial, is entitled to the same protection. In *Ashe v. Swenson, supra,* the Court defined the collateral estoppel rule as applicable to issues previously litigated between the "same parties." 397 U.S. at 443. *See Frank v. Mangum,* 237 U.S. 309, 334, 35 S.Ct. 582, 59 L.Ed. 969 (1915); *United States v. Friedman,* 506 F.2d 511, 517 (8th Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673, *rehearing denied,* 423 U.S. 885, 96 S.Ct. 160, 46 L.Ed.2d 116 (1975); *Ferina v. United States,* 340 F.2d 837, 839 (8th Cir.), *cert. denied,* 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *United States v. Gugliaro,* 501 F.2d 68, 70 (2d Cir. 1974); *United States v. Musgrave,* 483 F.2d 327, 332 (5th Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); *Spector v. United States,* 193 F.2d 1002, 1006 (9th Cir. 1952). The rule does not establish as "fact" any issue previously litigated unless the same parties are again before the court. As the Ninth Circuit observed in *Falk v. United States,* 370 F.2d 472, 475 (9th Cir. 1966), *cert. denied,* 387 U.S. 926, 87 S.Ct. 2044, 18 L.Ed.2d 982 (1967), "we have found no support for the astonishing contention that all witnesses in a successful defense of a criminal prosecution are immunized from subsequent charges of perjury under the doctrine of collateral estoppel." Similarly, that the jury found Brown not guilty in the prior perjury trial does not implicate Hendrix's double jeopardy rights in the conspiracy trial. Hendrix's motion in limine was properly denied.

### B.

The government proof showed Robert Hartgraves to be at the hub of the conspiracy. He communicated directly with coconspirators Jenkins and Lane. He also communicated directly with Hendrix. Hendrix had no direct contact with Jenkins or Lane. Larry Self, manager of the Pizza Inn at Jonesboro, testified on rebuttal that he saw Hartgraves and Hendrix together at the Pizza Inn several times during 1974 and also that he thought he saw them together in a police patrol car at least twice. Self testified that in 1974 Hendrix had told him that he was either going to be rich in the next year or be in prison. Aside from this testimony, which was merely corroborative of the association between Hendrix and Hartgraves, the government relied upon the testimony of Hartgraves to establish Hendrix's membership in the conspiracy.

No doubt in an effort to cast doubt upon Hartgraves's motive in giving testimony as a government witness, Hendrix's counsel asked Hartgraves on cross-examination if he had not previously said that Hendrix "had gotten after" him once. Hartgraves indicated the incident "was over speeding." Defense counsel then asked if it was not true that Hendrix and a deputy sheriff of the Craighead County Sheriff's Department had come out and investigated him in connection with a theft. Hartgraves replied, "They came out and investigated me of the theft of a motorcycle from Harrisburg. But, the only time he had ever been after me is—if you were talking about chases at the time—a speeding ticket."

The subject came up again during the defendants' case. On direct examination of Hendrix, defense counsel elicited from him testimony that he had occasion as a police officer to go with a Craighead County deputy sheriff to Hartgraves's house to check on a motorcycle theft. Hendrix testified that he had no other contact with Mr. Hartgraves except in "seeing him out from time to time—seeing him driving down the streets riding."

On cross-examination, the government attorney explored the incident more fully. When he inquired whether in the course of the investigation Hendrix had reported to his office that he could not find a serial number on the motorcycle at Hartgraves's,

Hendrix replied that he and the deputy had been unable to find a number. The prosecutor then asked him, "Isn't it true that the serial number was open and obvious, and you didn't even try to find that serial number . . .?" Hendrix replied, "That is a lie." In its rebuttal, the government called James Walker, an employee of the Craighead County Sheriff's Office, who testified that he had not been satisfied with Hendrix's explanation and had checked the motorcycle the next day and had found that the serial numbers matched those of the missing motorcycle. Two photographs of the motorcycle were then introduced into evidence. On cross-examination, it was brought out that the theft charge against Hartgraves was dropped. The government's obvious purpose in rebuttal was to meet the defense-planted inference of hostility between Hartgraves and Hendrix and show instead that a collusive relationship existed between the parties.

Following the government's rebuttal, Hendrix was permitted to recall two of his own witnesses who remembered the incident. Chief Gammill of the Jonesboro Police Department testified that there are multiple serial numbers on motorcycles that are frequently confusing. Hartgraves's father testified that the two officers had made two trips to check on the motorcycle.

In closing arguments, both sides made reference to the incident. Defense counsel argued the criminal character of Hartgraves and intimated that Hartgraves might have testified as he did because of his arrest over the motorcycle incident. He ended up calling the incident "insignificant." The government in closing argument suggested that it only responded to defense testimony casting doubt on Hartgraves's credibility and implied that Hendrix and Hartgraves were such good friends that Hendrix might have overlooked the serial number during his investigation in order to keep Hartgraves out of trouble.

He likewise concluded by saying that the incident was "not really that big a deal."

The issue presented on appeal is whether the District Court erred in admitting evidence of the motorcycle incident over objection of counsel. Hendrix contends that the testimony was admissible neither as evidence of other crimes nor to impeach his testimony on a collateral matter.

Two purposes can be advanced to justify the government's exploration of the motorcycle incident. First, Hendrix's alleged failure to report the motorcycle's serial numbers and his claim that he could not find the numbers were acts of misconduct that reflect on his character for truthfulness. As such, they were proper subjects of cross-examination under Fed.R.Evid. 608(b). Under this rule, however, acts of misconduct used for this purpose cannot be proven by extrinsic evidence. Thus the government's first purpose—impeachment by showing character for untruthfulness—justifies only the cross-examination of Hendrix and does not extend to the admission of other evidence concerning the motorcycle incident.[4]

■ The government, however, used the motorcycle incident for a second purpose. Hendrix had denied all but a fleeting association with Hartgraves and had implied that their one encounter on the motorcycle incident had produced a hostile relationship. The defense thus raised an inference that Hartgraves's testimony was influenced by prejudice against Hendrix. The government's version of the motorcycle incident tended to rebut this inference of prejudice by showing that in fact Hendrix may have protected Hartgraves from prosecution.

■ Upon a careful review of the record, we conclude that it was open to the government, within limits fixed by the trial court, to rebut the inference of prejudice by providing through extrinsic evidence that its version of the incident was true. On the

---

4. Nor would proof of these instances of misconduct by extrinsic evidence have been justified as relevant to the issue of guilt. Hendrix had placed his character in issue by presenting several character witnesses, but because char-

acter was not an essential element of the charge, proof of misconduct by extrinsic evidence was not permissible. *See* Fed.R.Evid. 405(b).

issue of bias or prejudice, proof can be made by extrinsic evidence. *See* Advisory Committee Note to Fed.R.Evid. 608(a); *Johnson v. Brewer,* 521 F.2d 556, 562 n.13 (8th Cir. 1975).

■ The nature and extent of the extrinsic evidence adduced to support or refute prior testimony lie in the sound discretion of the trial judge, who "has the responsibility for seeing that the sideshow does not take over the circus." C. McCormick, Handbook of the Law of Evidence § 49, at 81 (2d Ed. 1972). In this case, the extrinsic evidence implied negligence on the part of Hendrix in connection with the motorcycle investigation; it did not amount to, nor was it offered as, proof of other crimes, *see* Fed.R.Evid. 404(b), and need not be justified under one of the exceptions to the general rule excluding evidence of other crimes. In the context of this case, the evidence approaches but does not cross the line. We think it might have been better had the trial judge conducted a voir dire examination to anticipate the nature and extent of the extrinsic evidence and limited it accordingly. "Although cross-examination should ordinarily not be unduly restricted, especially where there exists a possibility of bias or prejudice of the witness, nevertheless the trial court is given broad discretion to weigh as well the possible prejudice which might ensue in opening up collateral matters." (footnote omitted) *United States v. Qualls,* 500 F.2d 1238, 1240 (8th Cir.), *cert. denied,* 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *see United States v. Miles,* 480 F.2d 1215, 1217 (2d Cir. 1973). If its management of this evidence was error, it was harmless beyond reasonable doubt.[5] *See United States v. Bishop,* 492 F.2d 1361, 1365 (8th Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 59, 42 L.Ed.2d 59 (1974).

---

**5.** It is significant that Hendrix opened up this line of inquiry. Otherwise it would have been improper for the government to attempt to reinforce Hendrix's participation in the conspiracy by proof of prior questionable activity with a coconspirator.

During cross-examination of Hendrix and one of his character witnesses questions were asked about Hendrix's extramarital conduct.

■ Finally, Hendrix contends that he should have been permitted a continuance in order to produce the testimony of the deputy who accompanied him to Hartgraves's house at the time of the motorcycle incident. The District Court permitted Hendrix to introduce testimony by the police chief that serial numbers were difficult to identify and also testimony by Hartgraves's father that Hendrix had made two trips to the farm. We think that the deputy's testimony was not crucial to the central issues in the case and that the trial judge did not abuse his discretion in denying the continuance.

### III.

In summary, we reverse the conviction of appellant Brown and remand to the District Court for entry of a judgment of acquittal. The conviction of appellant Hendrix is affirmed.

No objection was raised at trial, and the cross-examination of Hendrix was not plain error. *See* Fed.R.Crim.P. 52(b). Moreover, cross-examination of the character witness about this conduct was proper, because the witness was subject to cross-examination about specific instances of conduct relevant to his direct testimony. Fed.R.Evid. 405(a).