UNITED STATES of America, Plaintiff,

v.

William Carl SOUSLEY, Defendant.

No. 78–0097–01–CR–W–3–1.

United States District Court,
W. D. Missouri, W. D.

June 13, 1978.

MEMORANDUM AND ORDERS
GRANTING

DEFENDANT'S MOTION TO
DISMISS INDICTMENT

JOHN W. OLIVER, Chief Judge.

## I.

This case pends on defendant's motion to dismiss the government's five count indictment which alleges that the defendant, in violation of 18 U.S.C. § 1623, knowingly made five false material declarations when he testified on his own behalf in an earlier prosecution. In the earlier case the defendant was acquitted by a jury of a charge that he had aided and abetted the transfer of an illegal firearm in violation of 26 U.S.C. §§ 5861(e), 5871, and 18 U.S.C. § 2.

We need only reach the second ground of defendant's motion to dismiss, which alleges that the present prosecution of defendant Sousley violates the double jeopardy clause of the Fifth Amendment as applied in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and the progeny of that case. Demonstrating commendable cooperation with each other and with the Court, counsel for the parties have entered into two stipulations of fact to which numerous exhibits are attached. Rule 12(e) of the Federal Rules of Criminal Procedure, permits the determination of defendant's motion to dismiss before the trial of the general issue. In accordance with the requirement of the last sentence of Rule 12(e), we state on the record the essential findings which support our conclusion that under the undisputed factual circumstances of this case, defendant's motion to dismiss must be granted.

## II.

E. Eugene Harrison, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Thomas M. Bradshaw, Asst. Federal Public Defender, Kansas City, Mo., for defendant.

On July 12, 1977, a routine Firearms Act indictment was filed against Gerald W. Todd and William Carl Sousley, the latter being the defendant named in the false declaration indictment presently before the

Court. On August 31, 1977, counsel for defendant Todd filed a motion for mental examination and a notice of possible defense of insanity. The suggestions in support of that motion directed attention to the case of *Todd v. Goostree*, 493 S.W.2d 411 (Mo.App.1973), and alleged that defendant Todd "may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or to properly assist in his defense." Judge Hunter granted defendant Todd's motion for a mental examination on September 7, 1977. On the same day he continued the case until further order of court. The case was reached for trial on November 14, 1977.

On that date and before the trial commenced against defendant Sousley, co-defendant Todd withdrew his former plea of not guilty and tendered a plea of guilty to Judge Hunter in accordance with a plea bargain negotiated between the government and defendant Todd, which provided that the government would recommend that the Court sentence defendant Todd to not more than six months, with a period of probation to follow, under the split sentence statute.

The trial proceeded against defendant Sousley alone. The government's sole witness was ATF Agent James T. Cannia. After defendant's motion for acquittal filed at the close of the government's case had been denied, defendant Sousley testified on his own behalf. After denial of defendant's motion for acquittal at the close of the entire case, Judge Hunter submitted the case to the jury. The jury's attention was directed to Mr. Sousley's testimony that "he did not arrange for the sale of the firearm in question from Gerald Wayne Todd to Special Agent Cannia on October 30, 1976, or receive any money from that sale." Judge Hunter instructed the jury that "a defendant who wishes to testify is a competent witness; and that defendant's testimony is to be judged by you in the same way as that of any other witness."

The only evidence other than the testimony of Special Agent Cannia and defendant Sousley was the sawed-off shotgun, the documentary evidence which established without dispute that an application for transfer of the firearm had not been made, and an instruction from Judge Hunter that defendant Todd had pled guilty to the transfer of the firearm. After considering the testimony of the two witnesses and the additional evidence stated, the jury returned a verdict of not guilty.

It apparently did not occur to anyone that defendant Sousley should be subjected to further prosecution until after Todd's counsel, shortly before Judge Hunter was to impose sentence on defendant Todd, contacted the Assistant United States Attorney in charge of the prosecution in an effort to negotiate an amendment of the plea bargain under which defendant Todd had pled guilty. The parties have stipulated that Todd's counsel told the government that "Defendant Todd was willing to make a truthful statement concerning his knowledge of the circumstances of the case in consideration of Mr. Harrison [the Assistant United States Attorney] agreeing to amend the plea bargain so that the government, at the time of Todd's sentencing, would recommend probation."

The parties have also stipulated that Judge Hunter was advised, prior to the imposition of Todd's sentence that "the plea bargain had been amended and that the government would recommend probation at the time of sentence in light of the fact that Mr. Todd had given a statement to the United States Attorney's office, which is attached to the stipulation heretofore filed as Exhibit H." Judge Hunter, in accordance with the government's recommendation, placed Todd on probation as provided in the amended plea bargain.

The transcript of the proceedings before the grand jury which returned the pending indictment shows that the Assistant U. S. Attorney read 18 U.S.C. § 1623(a) to the grand jury and then stated that:

We have here a case where a gentleman by the name of William Carl Sousley was on trial for aiding and abetting in the transfer of a sawed-off shotgun, and

according to the federal laws, . . . it's simply illegal to be selling sawed-off shotguns. So he was on trial for the transfer of a sawed-off shotgun without having made application and he took the stand and testified and *as a consequence of his testimony,* . . . the jury found him not guilty of the transfer. . . . I am presenting to you for indictment . . . information . . which discloses that the testimony, certain pertinent parts of his testimony, while he was under oath and while he was on the stand in his trial, constituted false declarations under this statute, 18 United States Code 1623 and, therefore, I would like to present the case to you through Agent Jim Cannia of the Alcohol, Tobacco and Firearms Bureau to show that there is probable cause that he did make a false declaration under oath in violation of this statute. [Emphasis ours].

Special Agent Cannia was asked to share with the grand jury information that he had that would show "whether or not those declarations that Mr. Sousley made on November 15, 1977 (in his testimony at the trial of the firearms case), were true or false." [Ct. Exh. 2, p. 7]. Mr. Cannia then reviewed the statement defendant Todd had given the Assistant U. S. Attorney in order to obtain the amendment of his plea bargain. He also reviewed a statement the Assistant U. S. Attorney took from Neva Lois Cardenas, defendant Todd's girl friend, on December 16, 1977, the same day he had obtained the statement from defendant Todd. The Assistant U. S. Attorney then asked Special Agent Cannia "what is your personal knowledge as to what transpired on August 30, 1976, which would go to show whether or not Mr. Sousley's statements were true or false." [Ct. Exh. 2, p. 10–11]. Special Agent Cannia then repeated the substance of his testimony rejected by the trial jury in the initial firearms prosecution.

▮ Special Agent Cannia was then asked the following questions and gave the following answers:

Q. So as to these five declarations made by Mr. Sousley on November 14, 1977, while you testified he was under oath and while the transcript reflects that he was under oath, does this information go to show whether or not one or more of those declarations were false?

A. Yes, it does.

Q. And which ones?

A. All of them.

Q. Okay.

A. All five of them.

    \*    \*    \*    \*    \*    \*

Q. And from your investigation and from the information that's come to you since that time and your observations of Mr. Sousley while he was testifying, were you able to observe whether or not he was making those false declarations in a knowingly [sic] manner?

A. Yes, he seemed to be—understood what was going on.

Q. He knew what he was doing when he was testifying?

A. Yes, he knew what he was doing when he testified in federal court, yes.

The deputy foreman of the grand jury, in response to the Assistant U. S. Attorney's question as to whether the grand jury had any questions, made the following inquiry:

Q. (By the Deputy Foreman) Could you tell me at the original trial when these false declarations were made, why was no rebuttal testimony offered to show at that time that these declarations were false?

The grand jury transcript shows that the Assistant United States Attorney responded to that question as follows:

MR. HARRISON:

I think I can answer that. And at the trial, the only testimony that was given was the testimony of Agent Cannia and all this other information was not given to the jury, for various reasons which I would rather not go into at this point. Some of them were evidentiary, some of them had to do with the availability of witnesses at that particular point in time

and for various reasons the jury was not afforded all of this information. The only information they had was the testimony of Agent Cannia versus the testimony of the defendant.[1]

■ A stipulation of the parties provides a more complete answer to the question the deputy foreman of the grand jury asked the Assistant U. S. Attorney. Paragraph 5 of the second stipulation states that it is "undisputed that the government, for reasons of trial tactics only, did not call Mr. Todd as a witness in the trial of the first prosecution against defendant Sousley." The government has not attempted to explain what "trial tactic" may have suggested that it not call defendant Todd as a witness in the trial of defendant Sousley. The inquiry required by *Ashe* does not require that we make any finding in regard to what "trial tactic" may have controlled the government's decision to rely solely upon the testimony of Special Agent Cannia in the trial of its firearm case against defendant Sousley. For it is obvious that co-defendant Todd was in the courthouse the very day defendant Sousley was tried and therefore, in light of his plea of guilty, available to the government as a witness against defendant Sousley.

It is also stipulated that if permitted to do so, the government would call Thomas E. Rees, a paid informant for the ATF, as a witness at the second trial of defendant Sousley and that he would testify in accordance with a statement he gave Special Agent Cannia on April 28, 1977, long before the government's unsuccessful firearms prosecution of defendant Sousley. Thomas E. Rees was listed as a government witness on the government's witness list filed in the firearms case on September 2, 1977. While the government elected not to advise the grand jury concerning the reason Rees was not called as a witness in the firearms case, any doubt about that reason has been removed by the stipulation of the parties.

The second stipulation states the circumstances under which Thomas E. Rees was not called at the first trial:

It is undisputed that Thomas E. Rees was a paid informant for the ATF. The government anticipated calling Mr. Rees as a witness but he was not called for the following reason. In the first prosecution, Defendant Sousley filed a separate motion to produce information and records pertaining to any payments made by the government in connection with his work as a government informant, cooperating individual or prosecution witness, and all records or information pertaining to any agreement or understanding under which Mr. Rees would receive any benefit in consideration of information provided by the government or in consideration for his agreement to testify in the Sousley case or other criminal prosecutions. Assistant United States Attorney Harrison recognized that the motion was well taken and agreed to furnish the data re-

---

1. Our necessary examination of the entire grand jury transcript revealed that, at another point in the presentation of the case to the grand jury, the deputy foreman asked the Assistant United States Attorney: "What's the difference between perjury and a false declaration?"

The answer given the grand jury was not consistent with the principles stated in the leading case of *Weiler v. United States*, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945). *See* also, *La Rocca v. United States*, 337 F.2d 39 (8th Cir., 1964). The Assistant United States Attorney based his inaccurate answer on something he may "have been told at law school and other times."

While it is not necessary that we reach the first ground of defendant's motion, which alleged that the government's pending prosecution is in violation of the due process and equal protection clauses of the Fifth Amendment's protection against arbitrary and discriminatory prosecution, considerations relating to the proper administration of criminal justice require that we cannot properly ignore the obviously inaccurate legal advice given a grand jury impaneled by this Court.

United States grand juries, persons subject to potential indictment, and the proper administration of criminal justice in the courts of the United States require that Assistant United States Attorneys conduct sufficient legal research to be in a position to give accurate answers to questions which they may be asked by members of a grand jury and that neither they nor grand juries can properly rely upon what Assistant United States Attorneys may have been "told at law school and other times."

quested without a formal order from Judge Hunter. Mr. Harrison requested the ATF to produce the data relative to Mr. Rees as requested in the motion. The ATF, however, failed to make such production so that it could be turned over to counsel for defendant Sousley and it was agreed that Mr. Rees under the circumstances would not be called as a witness at the first prosecution. [Tr. June 7, 1978, p. 4–5]

Defendant Sousley's motion to produce was filed September 2, 1977, the same day the government listed Rees as a witness. The case went to trial on November 14, 1977. The government had over two months to produce data which it recognized it was under duty to produce. Under the circumstances it is impossible to make a finding that Rees was not available as a government witness at Sousley's first trial.

It is also stipulated that if the government is permitted to have defendant Sousley run the gantlet a second time, the "government anticipates that Agent Cannia will testify in the same manner in which he testified at the first trial." A careful examination of the transcript of that prospective witness's testimony at the first trial and of his testimony before the grand jury establishes that Agent Cannia would do no more than repeat at a second trial the same testimony which the jury rejected in the first trial. That testimony, of course, was diametrically opposed to the testimony which defendant Sousley gave at the first trial. Indeed, the parties have so stipulated.

The only other witness that the government would call, if permitted to do so, would be one Neva Lois Cardenas, defendant Todd's girl friend, who was not available at the original trial. She accompanied defendant Todd and gave her statement the same day defendant Todd was consummating his amendment of his initial plea bargain on December 16, 1977.

Appropriate inquiry into the record of the initial firearms prosecution against defendant Sousley and our consideration of the pleadings, evidence, charge and other relevant matters relating to that case affords an adequate and compelling basis to conclude whether a rational jury could have grounded its verdict upon an issue other than the resolution of an irreconcilable conflict between the testimony given by Special Agent Cannia on behalf of the government and the testimony of defendant Sousley given in his own behalf. We find under all the circumstances that the jury accepted defendant Sousley's testimony and rejected the testimony of Agent Cannia.

Through the exemplary cooperation of counsel, we are fully advised of the evidence which the government would seek to adduce in a second trial and to make the further finding that the government's evidence in a second trial would be substantially the same as that which the government presented or was in a position to present to the jury at the first trial. Under the stipulated factual circumstances, the government's evidence at the second trial would be precisely the same evidence adduced at the first except the government would attempt to call two witnesses who were available to the government at the first trial, assuming that the government had conducted its first prosecution in accordance with minimum standards required of federal prosecutors, and the "newly discovered" testimony of defendant Todd's girl friend. *See, ABA Standards Relating to the Administration of Criminal Justice: The Prosecution Function.*

For reasons we now state we conclude that application of the principles articulated in *Ashe,* as those principles have been most recently applied by our controlling Court of Appeals, require that defendant's motion to dismiss be granted.

### III.

The government's suggestions in opposition to defendant's motion to dismiss purport to recognize the impact of principles enunciated in *Ashe v. Swenson,* 397 U.S.

# 760

436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).[2] The government's contention, however, that *Ashe* articulated three "tests"—"the ultimate fact test," "the predicate test," and "the same transaction test"—ignores one of *Ashe's* most significant principles: the rule of collateral estoppel in criminal cases is not to be applied "with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." 397 U.S. at 444, 90 S.Ct. at 1194.[3]

*Ashe* expressly reaffirmed the rule applied thirty years ago in *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948), that where a previous judgment of acquittal was based upon a general verdict, the trial judge in a subsequent trial must "examine the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matters, and conclude whether a ra-

tional jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." 397 U.S. at 444, 90 S.Ct. at 1194. *Ashe* expressly approved the admonition of *Sealfon* that the inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." 397 U.S. at 444, 90 S.Ct. at 1194.[4]

The government concedes, as it must, that "the only issue in dispute for the jury to decide [in the firearm case in which a verdict of acquittal was returned] was whether the defendant had participated . . . in the transfer of a sawed-off shotgun without having first made application to do so." Each count of the pending indictment for alleged violations of 18 U.S.C. § 1623 centers upon testimony the defendant gave at trial which, in direct conflict with the sole witness called by the

---

2.  *Ashe's* principles were most recently affirmed and applied in *Harris v. Washington*, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971) and *Turner v. Arkansas*, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972). The latter case is particularly significant in the determination of this case with respect to "the only logical conclusion" which, under the circumstances there presented, could be drawn in regard to what the general verdict of acquittal in that case resolved and in regard to the Court's express rejection of the State's argument of what "the jury might have believed" in reaching its verdict of not guilty in the defendant's first trial.

3.  The government's reliance upon *One Lot of Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), and its attempted resurrection of *Hoag v. New Jersey*, 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958), in supplemental briefs filed on June 5 and 7, 1978, casts a measure of real doubt upon the government's purported recognition of the impact of *Ashe*. *One Lot of Emerald Cut Stones* is clearly distinguishable on its facts, and this Court and the Eighth Circuit were reversed by the Supreme Court in *Ashe* for having applied *Hoag* to the facts presented in *Ashe*.

    Giving full credit to Mr. Justice Blackmun's dissent in *Harris v. Washington*, 404 U.S. at 58, 92 S.Ct. 183, we believe that it can fairly be said that Mr. Justice Stewart's opinion for the Court and all three of the concurring opinions in *Ashe* reflect that the rationale of Chief Justice Warren's dissent in *Hoag* was implicitly approved in all four of those opinions. Chief Justice Warren's dissent in *Hoag* protested that

"[T]he suggestion that the jury might have acquitted because of a failure of proof that property was taken from the victims is simply unrealistic. The guarantee of a constitutional right should not be denied by such an artificial approach." 356 U.S. at 476, 78 S.Ct. at 837. As we shall later note in more detail in the text, the government argues that we should make substantially the same unrealistic and artificial approach to this case.

When this Court decided *Ashe* in 1967, *see, Ashe v. Swenson*, 289 F.Supp. 871 (W.D.Mo. 1967), we were required to apply what Chief Justice Warren described in his dissent in *Hoag* as an "unrealistic" and "artificial approach". As we decide this case in 1978 we are required to reject such an approach and to proceed with realism and rationality in accordance with *Ashe's* mandate.

4.  *Sealfon* reversed a conviction for aiding and abetting the uttering and publishing of false invoices introduced in evidence at a prior trial in which the defendant had been tried and acquitted on a charge of conspiracy to defraud the United States by presenting those invoices. The Supreme Court unanimously determined that "the basic facts in each trial were identical" and that "the core of the prosecutor's case in each case was the same." The Court therefore concluded that defendant's indictment for a different offense was simply "a second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be non-existent." 332 U.S. at 580, 68 S.Ct. at 240.

government, denied that he had in any way participated in the transfer of the sawed-off shotgun.

Count I of the pending indictment alleges that the defendant made a material false declaration when he denied at trial that he had "any conversation with Agent Cannia regarding the purchase of firearms." Count II centers on the defendant's denial that he had called "Gerald Wayne Todd on the phone and told him to come down there to sell that sawed-off shot gun." Count III relates to defendant's testimony that he did not "go in the parking lot and watch Gerald Wayne Todd sell Agent Cannia that sawed-off gun for $30.00." Count IV relates to defendant's testimony that he "did not sell a gun, no." And Count V alleges that defendant made a material false declaration when he denied that he had ever seen "Plaintiff's Exhibit 1," which was the sawed-off shotgun.

The first trial was a two witness case. Other than formal documentary proof, the government called only Agent Cannia to prove its case. A review of the trial testimony of Agent Cannia and that of the defendant reflects the not unusual situation of testimony of two witnesses in total and irreconcilable conflict.

If the jury at the first trial had believed Agent Cannia's testimony, it would have necessarily been required to reject the defendant's testimony that he had not talked with Agent Cannia about the purchase of any firearm and that he had not in any way participated in the transfer of the sawed-off shotgun. Although the government purports to concede that in the first trial "the jury by its verdict found that . . . the defendant had [not] participated . . . in the transfer of a sawed-off shotgun," and that such was "the only issue in dispute for the jury to decide," it nevertheless insistently argues that the government's second prosecution is not within the scope of principles announced and applied in *Ashe*. The government contends in all three of the briefs it has filed in opposition to defendant's motion to dismiss that its second prosecution of the defendant is constitutionally permissible under all three of the "tests" it attempts to read into *Ashe*.

The government argues that under what it calls its "ultimate fact" test, "the defendant is now being tried for making false declarations" and that "this issue is simply not the issue of ultimate fact that the first jury decided".

The government argues that its "predicate test" is satisfied because "the first jury did not necessarily have to find that the defendant was telling the truth as a predicate to its verdict," and that "the jury easily could have found upon this evidence [i. e., Agent Cannia's testimony] that the plaintiff failed to prove beyond a reasonable doubt that the defendant aided and abetted, without ever having to look at the defendant's testimony." Finally, the government argues with sophistical vigor that under its so-called "same transaction" test:

> The transaction in question in the first trial was the transfer of a sawed-off shotgun. The transaction here in question is the making of false declarations under oath before a federal district court. These are two separate and distinct transactions. Therefore, this prosecution is permissible under the doctrine of collateral estoppel."

Under *Ashe* and its progeny, we must reject the government's "hypertechnical and archaic approach" to the constitutional rule of collateral estoppel. In one of its most recent briefs the government states that it relies particularly on what it calls its "predicate" test, which, when stripped of its descriptive verbiage, is based on the notion that this Court is free to find, under the undisputed circumstances of this case, that "the jury easily could have found . . . that the plaintiff failed to prove that the defendant aided and abetted, without ever having to look at the defendant's testimony."

Such an argument is untenable both on the facts and the law. On the facts, Judge Hunter, by his denial of defendant's motions for acquittal made at the close of the government's case and at the close of the

entire case, conclusively determined that if the jury believed Agent Cannia's testimony, the government had adduced sufficient evidence to sustain a verdict of conviction.

█ Application of principles approved in *Ashe* forecloses unrealistic and artificial speculation about some far-fetched theory upon which the jury might have based its verdict of acquittal. *Ashe* requires a realistic inquiry into how a rational jury would consider the evidence presented in the particular case in which it rendered its verdict. When the Assistant United States Attorney told the grand jury what he then thought this case was all about, he stated in simple and realistic language that at the first trial Sousley "took the stand and testified and *as a consequence of his testimony,* . . . the jury found him not guilty of the transfer . . . .." [Emphasis ours]. The arguments which the government presents for our consideration in its effort to salvage its second prosecution of the defendant are totally inconsistent with the Assistant United States Attorney's earlier and rational statement that Sousley's acquittal was "as a consequence of his testimony."

In addition, Chief Justice Warren's dissent in *Hoag,* which we noted in footnote 2, anticipated *Ashe's* adoption of *Sealfon's* admonition to set the inquiry in a realistic and practical frame. *Turner v. Arkansas, supra,* involving, as does this case, a second prosecution arising out of "the same set of facts, circumstances, and the same occasion," expressly rejected the State's theory of what "the jury might have believed" in reaching its verdict of acquittal.

A realistic and rational application of the rule announced in *Ashe,* particularly as that rule has been most recently applied by our controlling Court of Appeals, requires that defendant's motion to dismiss must be granted.

## IV.

The most recent controlling Eighth Circuit opinion is *United States v. Brown,* 547 F.2d 438 (8th Cir. 1977), *cert. denied* 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). *Brown* involved, as the Court of Appeals noted, the most unusual factual circumstance that the first prosecution, in which the jury returned a general verdict of acquittal, was for perjury and the second prosecution was for conspiracy to rob a bank. The government charged in its perjury indictment that Brown had lied to a federal grand jury investigating a robbery of the Citizens Bank when he denied going to the Embassy Apartment for any purpose other than to visit a sick girl friend. The government attempted to prove at the perjury trial that Brown had lied by calling witnesses who testified that Brown had in fact gone to the Embassy Apartments in order to act as a pickup man of the money to be stolen from the Citizens Bank.

After reviewing the pleadings, record, and charge of the first prosecution, the Court of Appeals concluded that "the jury could not have acquitted Brown without first determining that he did not have discussions with Hendrix about the bank robbery conspiracy." 547 F.2d at 442. The Court of Appeals stated that "the narrow question before the trial jury, realistically, was whether he had lied about his noninvolvement in the conspiracy." 547 F.2d at 442. The Court of Appeals then concluded that:

> The jury must have believed his [Brown's] testimony [at the first trial]; it could not have grounded its verdict upon any other issue.

The Court of Appeals recognized in *Brown* that in most cases it is difficult "to ascertain from a jury's general verdict exactly what facts were necessarily found as a predicate to that verdict." 547 F.2d at 441.[5]

---

5. In one of its briefs the government quotes a portion of the same sentence from *Brown* which we have just quoted in the text. The government, without explanation, suggests that Judge Webster said what he said in that sentence for the purpose of defining "the phrase 'issue of ultimate fact' as used by the Supreme Court" in *Ashe.* The government then proceeds to attack the straw man it created by its truncation of a single sentence from *Brown* by stating that: "The plaintiff submits that this definition is overly broad and not intended by the Supreme Court."

*Brown* directed attention to a number of such difficult cases. *See* 547 F.2d at 442 n. 2. The Court of Appeals there directed attention to the type of case which does not present any difficulty by stating:

> When the issue in the first trial was narrow, however, and acquittal necessarily resolved an essential factual issue in a subsequent trial, collateral estoppel has been applied to reverse a conviction in the subsequent trial. See *Turner v. Arkansas,* 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972); *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Johnson v. Estelle,* 506 F.2d 347 (5th Cir.), cert. denied 422 U.S. 1024, 95 S.Ct. 2619, 45 L.Ed.2d 682 (1975); *McDonald v. Wainwright,* 493 F.2d 204 (5th Cir. 1974); *United States v. Nash,* 447 F.2d 1382 (4th Cir. 1971); *United States v. Kramer,* 289 F.2d 909 (2d Cir. 1961); *United States v. Simon,* 225 F.2d 260 (3rd Cir. 1955); *Cosgrove v. United States,* 224 F.2d 146, 158 (9th Cir. 1955); *Erlich [Ehrlich] v. United States,* 145 F.2d 693 (5th Cir. 1944).

The cases cited with approval by the Eighth Circuit in *Brown* reflect the line of cases which are applicable to this case. While further discussion of the Supreme Court's decision in *Turner* and *Ashe,* both cited by the Eighth Circuit in footnote 2 in *Brown,* would be redundant, the government's apparent difficulty in comprehending the constitutional principles announced in those Supreme Court cases suggests that attention should be directed to the cases closest on point from other Circuits cited by our controlling Court of Appeals in *Brown.*

*United States v. Nash,* (4th Cir. 1971) 447 F.2d 1382, reversed and remanded a district court conviction for perjury for entry of a judgment of acquittal obtained after defendant's initial acquittal of a mail theft charge. In that case, as in this, the defendant was indicted for testimony given at the first trial. In the first trial, postal inspectors testified that they had planted an envelope containing three 25¢ pieces on a piece of cardboard and observed the defendant from a hidden observation station take the envelope from a mail box.

Defendant admitted possession of three quarters but testified that she had obtained the quarters from a coin changing machine located on the post-office premises. The Fourth Circuit applied principles stated in *Ashe* and *Sealfon* and concluded that "the jury in the first case undoubtedly passed upon the believability of Estelle Nash's statement made under oath." The Fourth Circuit noted that while the first jury may have been mistaken in its judgment, "certainly it appraised the defendant's credibility" and that "it is inconceivable that there would have been an acquittal if the jury had not accorded truth to her testimony."

The Fourth Circuit noted the obvious when it stated that because the first jury had "two conflicting explanations" of the defendant's possession, it "necessarily" had to pass upon the truthfulness of the defendant's testimony as given at the first trial. *Nash* concluded that a redetermination of that truthfulness in "a trial for another offense is estopped."

*United States v. Kramer,* 289 F.2d 909 (2nd Cir. 1961), also cited with approval in *Brown* involved a case in which the government was permitted to offer testimony in a second trial "substantially identical with that which it had offered in the first trial." Judge Friendly stated that:

> There can hardly be mystery as to what was determined by the verdict of "not guilty" [in defendant's first trial], general though it was. The jury was asked to determine a single question, of

---

We are under duty to give a reasonable construction to what was actually said in *Brown.* Judge Webster followed what he said in the quoted sentence with a sentence which said: "We are admonished by the Supreme Court, however, not to be hypertechnical but to approach the question with realism and rationali-

ty." We reject the government's strained and inaccurate quotation of but a portion of the preceding sentence and follow *Brown's* accurate paraphrase of the Supreme Court's admonition in *Ashe* to approach the question with realism and rationality.

the starkest simplicity: Was Kramer responsible for what happened in the Wilton or Orange post offices on the nights of the burglaries, or wasn't he?

The judgment of conviction on defendant's second trial for different offenses involving the same two post offices was reversed with directions to enter a judgment of acquittal. Judge Friendly concluded in an opinion written before *Ashe* but after *Sealfon* that:

A defendant who has satisfied one jury that he had no responsibility for a crime ought not to be forced to convince another of this, even in a prosecution where in theory, although very likely not in fact, the Government need not have tendered the issue. . . . [T]o permit the Government to force a defendant who has won an acquittal to relitigate the identical question on a further charge arising out of the same course of conduct, selected by the Government from the extensive catalogue of crimes furnished it in the Criminal Code, would permit the very abuses that led English judges to develop the rule against double jeopardy long before it was enshrined in the Fifth Amendment, 3 Holdsworth, History of English Law, 614—and still longer before the proliferation of statutory offenses deprived it of so much of its effect. [289 F.2d at 915] [6]

We shall direct attention to only two cases which were not cited in *Brown*. *United States v. Drevetzki,* 338 F.Supp. 403 (N.D.Ill.1972), presented factual circumstances which are very close to those presented in this case. In that case Judge Marovitz dismissed a perjury indictment filed in regard to testimony the defendant gave on his own behalf in a prior case. In the prior case defendant was charged with unlawful theft from an interstate shipment and was acquitted. Judge Marovitz concluded that "the finding of not guilty in the trial for theft is so inseparably intertwined with the issue of Defendant's veracity regarding his statement to the agent as to render any perjury charge regarding his testimony at trial about that statement in violation of the prohibition against double jeopardy." *Drevetzki* held that application of the principles announced in *Ashe* required dismissal of the indictment because "the issue determined in the first trial was that Drevetski did not steal the goods in question" and that "a rational jury could not have found Defendant not guilty had they believed the agent's testimony rather than the Defendant's." Consistent with the command in *Ashe,* in regard to what ground a rational jury could have reached its verdict, Judge Marovitz had the following to say about the conflict between the testimony of the government agent and the testimony of a defendant on trial:

The testimony of an F.B.I. agent regarding a statement of admission made by a Defendant is bound to have a profound effect on the minds of a jury. The fact that a jury found the Defendant not guilty in spite of that testimony indicates that they considered both statements and chose to believe Defendant's statement over that of the agent. A jury could not have reached its conclusion without considering that issue. The finding of not guilty is therefore the same as determining that the statement of admission was not made to the agent and that issue

**6.** *See also, Ehrlich v. United States,* 145 F.2d 693 (5th Cir. 1944), another one of the cases cited in *Brown's* footnote 2. It is interesting to note that the Fifth Circuit relied, among other cases cited, on the early Eighth Circuit case of *Chitwood v. United States,* 178 F. 442 (8th Cir. 1910). *Chitwood* reversed a conviction of perjury obtained after the defendant had been acquitted of a postal offense. The Eighth Circuit stated in that case: "If the accused was acquitted of the prior charge, as the excluded court records showed, the issue of guilt was conclusively settled against the government for every purpose, and could not again be drawn in question as a makeweight in another prosecution. A person acquitted of a crime cannot be again tried for it under the guise of a charge of perjury. . . . Nor can the government reassert guilt of the first offense to sustain a charge of perjury in securing an acquittal."

The Eighth Circuit said much the same thing in *Youngblood v. United States,* 266 F. 795 (8th Cir. 1920), when it stated that "the government should not institute a prosecution for perjury on substantially the same evidence presented on the first trial."

cannot be again litigated. Thus the perjury indictment fails the *Ashe v. Swenson* test. 338 F.Supp. at 408.

The most recent case reversing a perjury conviction based upon alleged false testimony given at a prior trial is *United States v. Hernandez,* 572 F.2d 218 (9th Cir. 1978), which was closely analogous and ruled on the same basis as *United States v. Nash, supra. Hernandez,* of course, was decided after the Eighth Circuit handed down *Brown.*

As is apparent from our analysis above, application of our controlling court's latest decision in *Brown,* applying *Ashe* and *Turner* requires under the stipulated factual circumstances presented in this case, that defendant's motion to dismiss should be granted.

For the reasons stated, it is

ORDERED (1) that defendant's motion to dismiss should be and the same is hereby granted. It is further

ORDERED (2) that the indictment in the above entitled cause should be and the same is hereby dismissed with prejudice.