(No. 48666.- )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. WEBBER BORCHERS, Appellant.

*Opinion filed September 20, 1977.*

Fuller & Hopp, of Decatur (Glenn O. Fuller, of counsel), for appellant.

William J. Scott, Attorney General, and C. Joseph Cavanagh, State's Attorney, both of Springfield (Raymond McKoski, Assistant Attorney General, of Chicago, of counsel), for the People.

MR. CHIEF JUSTICE WARD delivered the opinion of the court:

The defendant, Webber Borchers, was elected to the Illinois House of Representatives in 1968. In the spring and early summer of 1970, he submitted two vouchers to the State of Illinois for payment. The first requested payment of $1,500 to Jeanette Weber for secretarial and clerical services performed for Borchers between September 1, 1969, and January 31, 1970. The second requested that the State pay Miss Weber $150 for secretarial services she performed for the defendant in June of 1970. Both vouchers required Borchers to certify "that the services or materials represented in this voucher were received or authorized, that the amount is correct and hereby approved for payment." Accompanying the vouchers were "bill forms" signed by the defendant in which the purpose or reason for the payment was also stated.

The only secretarial or clerical services performed by Miss Weber for the defendant were the filling out of the two vouchers and the typing of a few letters. Miss Weber did not receive any of the funds obtained from the filing of the vouchers. When the warrants for $1,500 and $150 were sent to her by the State, she endorsed them and turned them over to her employer, Christian Homeier, who was the defendant's seatmate in the legislature. Borchers received approximately $1,200 of the $1,650 from Homeier, and Homeier retained the balance.

In November of 1974, the defendant and Homeier were named as defendants in an 18-count indictment returned in the United States District Court for the Southern District of Illinois. Borchers was charged in two counts with mail fraud (18 U.S.C. sec. 1341 (1970)) and in one count with conspiring with Homeier to violate the mail fraud statute (18 U.S.C. sec. 371 (1970)). In essence the indictment charged that Borchers devised a scheme to defraud the State of Illinois by falsely representing that Jeanette Weber performed secretarial and clerical services for him, that he used the mails in furtherance of the scheme and that he conspired with Christian Homeier to commit the substantive offenses charged in the first two counts. Borchers was tried before a jury and was found not guilty.

In January of 1975 Borchers was indicted in the circuit court of Sangamon County. He was charged in several counts with perjury, theft and official misconduct. This indictment was dismissed on the motion of the State's Attorney, and a superseding indictment charging the same offenses was returned in April of 1975. Defendant was tried in November 1975 in the circuit court of Sangamon County. Prior to trial, all of the counts against the defendant were dismissed on his motion except for three counts charging theft of more than $150, theft of less than $150, and official misconduct. The indictment as it

remained charged in substance that Borchers committed two crimes of theft when he submitted the vouchers and received the money and that he committed official misconduct in that while a member of the legislature he committed the crime of theft. A jury found him guilty on the three charges. The trial court held unconstitutional section 115–4(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 115–4(f)), which concerns the, *voir dire* examination of jurors. Defendant appealed directly to this court under our Rule 302(a), which provides that "[a]ppeals from final judgments of circuit courts shall be taken directly to the Supreme Court (1) in cases in which a statute *** of this State has been held invalid ***" (58 Ill. 2d R. 302(a)). Because of the disposition we make of this appeal, we need not consider whether, as the trial court held, the statute unconstitutionally conflicts with our Rule 234 (58 Ill. 2d R. 234).

The defendant contends *inter alia* that the State prosecution was barred by section 3–4(c)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 3–4(c)(2)), which in part provides:

> "(c) A prosecution is barred if the defendant was formerly prosecuted in a District Court of the United States or in a sister State for an offense which is within the concurrent jurisdiction of this State, if such former prosecution:
> ***
> (2) Was terminated by a final order or judgment, even if entered before trial, which required a determination inconsistent with any fact necessary to a conviction in the prosecution in this State."

The defendant says that this section prohibits "any prosecution by the State in which a fact necessary to convict has been conclusively determined by a prior federal prosecution." His contention is, in effect, that the legislature has extended the doctrine of collateral estoppel to successive prosecutions by the Federal and State

governments for criminal offenses arising out of the same conduct.

This court recently discussed collateral estoppel in *People v. Williams* (1975), 59 Ill. 2d 557, 560-62:

"The doctrine of collateral estoppel, which bars relitigation of a decided question, applies to criminal as well as civil proceedings. (*People v. Grayson,* 58 Ill. 2d 260; *People v. Armstrong,* 56 Ill. 2d 159; *People v. Haran,* 27 Ill. 2d 229, 232.) This was noted in *Ashe v. Swenson,* 397 U.S. 436, 25 L. Ed. 2d 469, 475, 90 S. Ct. 1189, where, in the course of describing the doctrine, the court said:

' "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer,* 242 U.S. 85, [61 L. Ed. 161, 37 S. Ct. 68, 3 A.L.R. 516].'

\* \* \*

This court noted in *People v. Haran,* 27 Ill. 2d 229, 231, that the doctrine of collateral estoppel was 'well defined' in *Hoffman v. Hoffman,* 330 Ill. 413. There it was said:

'Where some controlling fact or question material to the determination of both causes has been adjudicated in the former suit by a court of competent jurisdiction

and the same fact or question is again at issue between the same parties, its adjudication in the first cause will, if properly presented, be conclusive of the same question in the later suit, irrespective of the question whether the cause of action is the same in both suits or not. This is sometimes denominated as an estoppel by verdict. (*Public Utilities Com. v. Smith,* 298 Ill. 151.) The rule in respect to the conclusiveness of the verdict and former trial between the same parties, when the judgment is used in pleading as a technical estoppel or is relied on by way of evidence as conclusive *per se,* is, that it must appear by the record of the prior suit that the particular controversy sought to be construed was necessarily tried and determined,—that is, if the record of the former trial shows that the verdict could not have been rendered without deciding the particular matter it will be considered as having settled that matter as to all further actions between the parties; and further, in cases where the record does not show that the matter was necessarily and directly found by the jury, evidence *aliunde* consistent with the record may be received to prove the fact. But even where it appears from the intrinsic evidence that the matter was properly within the issue controverted in the present suit, if it be not shown that the verdict and judgment necessarily involved its consideration and determination it will not be concluded.' 330 Ill. 413, 417."

There are at times problems presented in seeking to

apply the doctrine of collateral estoppel in criminal cases; it is sometimes difficult to determine what facts were actually adjudicated by the former verdict. (See *People v. Haran* (1963), 27 Ill. 2d 229, 235.) Where the prosecution has had to prove several elements, a verdict of acquittal does not inform as to the basis for the jury's verdict. But the difficulties of application are not, of course, insuperable. This was illustrated by the Supreme Court in *Ashe v. Swenson* (1970), 397 U.S. 436, 444, 25 L. Ed. 2d 469, 475-76, 90 S. Ct. 1189, 1194:

> "The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon v. United States*, 332 U.S. 575, 579. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal."

The defendant says that the only contested issue in both trials was whether he had the required criminal intent. In the Federal trial the question was whether he had a scheme and intent to defraud the State of Illinois, he

says, and in the State trial the question was whether he had the wrongful intent to deprive the State of Illinois permanently of the use and benefit of the money. He states that the evidence presented in each prosecution on the issue of intent was the same and that the fraudulent intent that had to be shown in both cases was the same. From this he contends that the Federal jury, by acquitting him, in the language of section 3–4(c)(2), made a "determination inconsistent with any fact necessary to a conviction in the prosecution in this State." That is, he says, since the verdict in the Federal prosecution decided the issue of fraudulent intent the issue was also settled so far as a State prosecution would be concerned and thus the State was barred from prosecuting him. We consider that the defendant's contention is correct.

He has filed here the record in his Federal trial. The evidence in both the Federal and State trials was, with minor exceptions, the same. In both cases the prosecution showed that the defendant signed the vouchers and the bill forms, that Jeanette Weber performed minor secretarial services for the defendant, that she endorsed the warrants and turned them over to Homeier, and that the defendant received approximately $1,200 of the funds obtained. In the Federal trial it was also shown that the mails had been used.

The defendant did not challenge any of this evidence in either of the trials. Indeed, he freely admitted that he had used the vouchers to obtain funds for himself. He testified that in the late 60's and early 70's he was concerned about disturbances at campuses at various State-supported colleges in Illinois. He said that in the spring of 1969 he was approached by Dan Jones, who offered to gather information for him about campus unrest. He testified that over a 12-month period Jones reported to him on numerous occasions about "radical activities" on college campuses and that he used this

information to draft bills and resolutions in the legislature. He stated, too, that he paid Jones $2,450 from his own funds for this undercover work and that Jones refused to sign a State voucher or give the defendant his social security number because he, Jones, said that his life would be in danger if his identity became known. At their last meeting in June of 1970, the defendant said, he persuaded Jones to sign cards which showed the date and amount of all the payments he had made to Jones. The defendant said he did not know the whereabouts of Jones and that he was unable to produce Jones as a witness. The copies of the cards were introduced into evidence at both trials.

Borchers said that he felt that the cost of employing Jones was an expense that could be legitimately charged against his legislative expense account. He could not, however, obtain funds for this purpose without Jones' signature on the voucher and his social security number. He testified that in the early spring of 1970 he approached Christian Homeier, the fellow legislator, and asked Homeier if he knew of a way in which the defendant could secure funds through his expense account to reimburse himself for the expenses he incurred in the employment of Jones. Borchers said that Homeier told him to sign a blank voucher and bill form for $1,500 and that Homeier later gave him $1,100. He said that at that time he was under the impression that the voucher had been filled in to show that the money was to be used for campus investigations and that Homeier was to give the $400 to Jeanette Weber to pay for the income taxes she would owe on the $1,500 since she appeared as the payee on the voucher and to compensate her for some clerical work she had performed for him. He testified that in July of 1970 he had instructed Miss Weber to fill out the second voucher for $150 to show that the money was for investigative purposes; that he signed the voucher before she filled it in, and that he kept $100 and gave her $50 to

pay her for some clerical services and to cover her income tax. He stated that he did not find out until October of 1973 that Homeier had kept the $400 from the proceeds of the first voucher and had gotten the $50 from the second voucher and that the vouchers had not been filled in and submitted according to his instructions.

In his closing argument at the Federal trial, the attorney for the defendant stated the only question that was presented by the evidence for the jury's determination:

> "So, we boil ourselves down after all these days of evidence and argument and questions and what have you to a really rather simple narrow issue and that is that when Mr. Borchers submitted these vouchers or caused them to be submitted did he do so with bad faith and with an intent to defraud the State of Illinois and intend to steal money for his own use and benefit, or did he on the other hand act in good faith in submitting these vouchers believing that he had a right to use the money to reimburse himself for the payment of the investigator to whom he had advanced money over a period of time and for whom he submitted these vouchers."

Similarly in the State prosecution, no other question—such as whether the vouchers had been submitted to the State—being in dispute, the only question presented for the jury's determination was the defendant's intent. That question could be stated: "Did the defendant when he submitted the vouchers wrongfully intend to permanently deprive the State of Illinois of the use and benefit of the money or did he intend to use the money simply to reimburse himself for the expenses he incurred in employing the investigator?"

We have reviewed the records in the Federal and State trials, and they are practically alike so far as the evidence presented is concerned. Indeed, it can be said here that the two records excepting, of course, proof of use of the mails, are nearly interchangeable, even as to the reputation

witnesses called by the defendant. With a few minor exceptions the testimony is the same. Viewing the question realistically and "set in a practical frame" (*Ashe v. Swenson* (1970), 397 U.S. 436, 444, 25 L. Ed. 2d 469, 475-76, 90 S. Ct. 1189, 1194) we consider that the questions were the same. The controlling fact or question in both prosecutions was whether or not the defendant had an intent to commit a fraud. The verdict of acquittal in the Federal prosecution resolved this factual question in favor of the defendant, and his conviction under the State prosecution required that the same factual question be resolved in favor of the prosecution. Thus relitigating this factual question was violative of the doctrine of collateral estoppel.

A case with resemblance to the one here is *Johnson v. Estelle* (5th Cir. 1975), 506 F.2d 347, *cert. denied* (1975), 422 U.S. 1024, 45 L. Ed. 2d 682, 95 S. Ct. 2619, which involved a question of specific criminal intent. There the United States Court of Appeals for the Fifth Circuit held that under the doctrine of collateral estoppel a second prosecution was barred in a case in which one of the questions presented to the juries in two successive trials was whether the defendant had an intent to commit rape. Billy Lee Johnson was found not guilty of "burglary of a private residence at nightime with intent to commit rape," and five months later he was convicted of "assault with intent to commit rape." (506 F.2d 347, 348.) Both charges grew out of the same incident of home invasion. The court first noted that only two issues were presented at the first trial upon which the jury could have based its verdict of acquittal and which were at issue in the second trial: (1) Was Johnson the assailant; and, (2) did the assailant have the intent to commit rape. (506 F.2d 347, 350.) The court then concluded that the second prosecution was barred by the doctrine of collateral estoppel because the jury in the first trial in order to have acquitted

Johnson must have found against the prosecution on one of the two issues and because the prosecution had to prove both issues in the second trial in order to have obtained a conviction. The court was not impressed by the speculative contentions of the State that the first acquittal might have been grounded on a relatively minor distinguishing circumstance, for example, a failure to prove the private character of the residence entered or that the defendant entered without breaking. The court said:

"By its injunction to apply collateral estoppel with 'realism and rationality' we believe that the Supreme Court [in *Ashe*] means that we should not allow a second trial, merely because technical requisites of the first charge are not involved in the second, where there is no evidence suggesting that those factors were even presented to the first jury for its active consideration. ***

We are convinced that both juries stood their decisions on identity of assailant and intent to rape and did not engage in mental gymnastics so as to land on differing components." *Johnson v. Estelle* (5th Cir. 1975), 506 F.2d 347, 352. See also *United States v. Brown* (8th Cir. 1977), 547 F.2d 438, *cert. denied* (1977), 430 U.S. 937, 51 L. Ed. 2d 784, 97 S. Ct. 1566; *McDonald v. Wainwright* (5th Cir. 1974), 493 F.2d 204; *United States v. Nash* (4th Cir. 1971), 447 F.2d 1382.

For the reasons given, the judgment of the circuit court is reversed.

*Judgment reversed.*