THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH A. WHARTON, Defendant-Appellant.

Fourth District    No. 4—00—0769

Opinion filed October 28, 2002.

MYERSCOUGH, J., dissenting.

Daniel D. Yuhas and Robert N. Markfield, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Perry L. Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE APPLETON delivered the opinion of the court:

A jury acquitted defendant, Joseph A. Wharton, of home invasion (720 ILCS 5/12—11 (West 1998)) but deadlocked on the remaining two counts, armed robbery (720 ILCS 5/18—2(a) (West 1998)) and residential burglary (720 ILCS 5/19—3(a) (West 1998)). The trial court entered a judgment of acquittal on the count of home invasion and declared a mistrial on the other two counts. Invoking collateral estoppel and double jeopardy, defendant filed a motion to bar the State from reprosecuting him for the alleged armed robbery and residential burglary. The trial court denied the motion, and, pursuant to Illinois Supreme Court Rule 604(f) (188 Ill. 2d R. 604(f)), defendant appeals from that ruling. We reverse.

## I. BACKGROUND

On February 2, 2000, the State filed three counts against defendant, numbered V, VI, and VII. Defendant pleaded not guilty to all three counts. Count V (home invasion) stated:

"[O]n or about November 28, 1999, in the County of Macon, Illinois, [defendant] did commit the offense of HOME INVASION, [i]n that said defendant, not a peace officer acting in the line of duty, knowingly, and without authority, entered the dwelling of Darin Hill and James Foreman, located at 375 Olympic Lane #96, Decatur, Macon County, Illinois, knowing or having reason to know Darin Hill and James Foreman to be present within that dwelling and intentionally caused injury to Darin Hill in that said defendant struck Darin Hill in the head with a gun."

Count VI (armed robbery) stated:

"[O]n or about November 28, 1999, in the County of Macon, Illinois, [defendant] did commit the offense of ARMED ROBBERY, [i]n that said defendant, while armed with a dangerous weapon, a gun, took property[,] being a cellular [tele]phone, pager, and U.S. [c]urrency, from the presence of Darin Hill and James Foreman, by threatening the imminent use of force."

Count VII (residential burglary) stated:

"[O]n or about November 28, 1999, in the County of Macon, Illinois, [defendant] did commit the offense of RESIDENTIAL BURGLARY, [i]n that said defendant knowingly, and without authority, entered into the dwelling place of Darin Hill and James

Foreman, located at 375 Olympic Lane #96, Decatur, Macon County, Illinois, with intent to commit therein a theft."

The trial court read a statement of the case to the prospective jurors, paraphrasing the three counts quoted above. In stating the charge of home invasion, the trial court said: "It is alleged *** that *** [d]efendant *** intentionally caused injury to Darin Hill in that he struck Darin Hill in the head with a gun." During his opening statement, the prosecutor said there would be evidence that an intruder "struck [Darin Hill] in the back of the head with what he believed to be a gun."

The trial lasted three days, May 17, 18, and 19, 2000. The State's first witness was Darin Hill, 19 years old. He testified that on November 28, 1999, he resided in apartment No. 96 at 375 Olympic Lane. He shared the apartment with James Foreman. The apartment had a sunken living room, and upstairs there were two bedrooms, his and James's. At approximately 6 p.m., Darin and his girlfriend, Tiffany McQueen, arrived at the apartment and watched television, alone, in the living room, for about two hours. At approximately 8 p.m., James arrived and went to his bedroom. Darin and Tiffany stayed in the living room for a couple more hours, watching television.

Darin testified that at approximately 10 or 10:30 p.m., there was a knock on the door upstairs. He went upstairs and put his eye to the peephole. Seeing no one and suspecting a prank, he opened the door and looked into the hall. He caught a glimpse of someone in a ski mask and coat running around the corner. The mask was a dark color, perhaps blue. "A split second" later, this person smashed him in the nose with what Darin believed was a gun (although he "really [did not] know what [he] got hit with," it happened so fast). Darin spun around and bent over, covering his nose, and as he ran into the apartment, the assailant pursued him and hit him on the back of the head. Darin's shoulder collided with James's bedroom door, and he fell to the floor, unconscious.

When Darin awoke, blood was running from his nose and the back of his head onto the carpet. He testified he saw James lying facedown on his bed and Tiffany getting up from his own bed. Darin asked if "they" were gone. Receiving no response, he staggered to his feet, went to a bathroom, and wiped the blood off his face. Then he looked for a telephone. The one in the dining room was ripped out of the wall. Tiffany's cellular telephone was missing from her purse, and James's was missing from his bedroom. Darin found his own cellular telephone in his bedroom and called his brother. When the prosecutor asked Darin why he did not call the police, he said he did not know. His brother drove him to the emergency room, where there was a

police officer, and Darin told the officer of the robbery. The wound on the back of Darin's head required stitches. He also had a concussion, broken nose, and swollen hand.

Darin admitted on the stand that he told the police "a different story" "[f]rom what [had] really happened." He falsely told the police officer that Tiffany and James were not present in the apartment during the robbery. He was afraid if he revealed Tiffany was there, her parents would not let her come over any more. He did not know why he had lied about James. He also told the officer, incorrectly, that he was standing in the hall, unlocking the door, when the assailant approached him from behind and hit him on the back of the head.

The day after the robbery, when Darin returned to his apartment, he discovered that not only the cellular telephones but also his pager, his keys, and the "face" to his compact-disc player and car stereo were missing. Two weeks later, he told the Decatur police precisely what had happened, including who was in the apartment when the robbers entered.

Darin testified he never gave defendant permission to enter his apartment and he did not even know him. He had no personal knowledge that the assailant who entered his apartment on November 28 was indeed defendant, because "[t]he only person [he] saw had a mask on" and he never heard the assailant speak. He did not know Franklin Small, either (a name that would emerge again in the trial). Darin testified, however, that he was acquainted with James's friend, Cory Zimmer, who had been to the apartment three times. Darin and James frequently threw parties in their apartment.

Tiffany McQueen, 19 years old, testified that when Darin went upstairs from the living room to answer the door, she heard a commotion, as if someone were "being thrown into the wall and pushed around," and Darin saying, "Stop it!" The stairway had only three or four steps. She stood on the couch to see what was happening. At the top of the stairs, a "[s]hort, kind of skinny" man in a white stocking cap pointed a handgun at her face. She sat down, and he descended the stairs and said, "Come with me." She glanced up at him quickly and looked back down. He had no ski mask on. Scared for her life, she noticed only that he had light-colored eyebrows—"[n]ot brown, but not blond." When she did not immediately stand, he said move or he would shoot.

They went upstairs, she first and he behind her. He told her to go to the "back bedroom" (Darin's bedroom) and warned her, "[D]on't say anything, don't move[,] or I will hurt you." On the way to the bedroom, she saw Darin lying on the floor, by James's door, and a man crouching over him with his knee in his back and pointing a gun at the back of his head. She stepped over Darin.

As Tiffany lay on Darin's bed, someone called out, "Cory, are you all right?" She testified she did not recognize that voice. Right before the intruders departed, one of them said, "I should kill one of you mother-fuckers," and the man sounded like Cory Zimmer. (She had encountered Cory a couple of times in the past, when he came with James to her parents' house.) The bed was by a window, and she heard the footfalls of two or more people running on the sidewalk outside. Then Darin came into the bedroom, blood streaming down his neck.

According to Tiffany, "all [three] of our cell[ular] [tele]phones were gone" after the robbery: hers, Darin's, and James's. Darin's keys were gone, too, but she used a spare set to drive Darin's Blazer to her parents' house. A detective of the Decatur police department, Patrick Campbell, showed her some photographs, but she did not recognize anyone in them.

James Foreman, 21 years old, testified he arrived at the apartment at 9 p.m. Soon afterward, he went to his bedroom and got ready for bed because he had to work the next day. As he lay in bed, watching television, he heard wrestling and commotion in the apartment. A body struck his bedroom door. He grabbed a baseball bat, opened the door, and saw two men in the apartment. One of them, wearing a ski mask, pointed a handgun at his face and told him to lie facedown on the bed. James obeyed. Then, shoving the handgun into the back of his head, the man said, "Give me your money," or words to that effect. James told him it was on his dresser, in the closet. The man snatched up the cash (no more than $200, according to James) and left the bedroom. To James's knowledge, no other money was anywhere else in the apartment.

James testified he heard a name, " 'Cory, Cory[,]' twice[,] and then someone said[,] 'I will kill one of you mother-fuckers.' " He recognized none of the voices, however, and knew more than one person named Cory, including Cory Zimmer. None of the Corys, other than his friend, Cory Zimmer, had ever been to the apartment. Cory Zimmer had been to the apartment 5 to 10 times, but on November 28, 1999, he had no authority to be there. James had no knowledge that Cory Zimmer was one of the intruders. He did not know Franklin Small, Gary Fischer, or defendant. On December 7, 1999, James told Campbell that the man in the ski mask might have been black, because the neck and the skin visible through the eye holes appeared to be dark, but because the apartment was dark, James was uncertain. He estimated the man to be 5 feet 10 inches to 6 feet tall and to weigh 160 to 190 pounds.

Jason Boesdorfer, a detective of the Decatur police department, testified that at 12:03 a.m. on November 29, 1999, he went to Decatur

Memorial Hospital to speak with the victim of a battery. The victim, Darin Hill, had a laceration on the back of his head and on his left hand. Boesdorfer photographed the injuries. With Darin's consent, he searched the apartment and saw blood on the carpet. Boesdorfer described Olympic Village as an apartment complex with a main road running through it, north and south. East and west, off this road, there were parking lots, and before the road dead-ended, it turned west.

Donna Scott testified that defendant was her cousin and Cory Zimmer was her ex-boyfriend. At approximately 2 p.m. on November 28, 1999 (when she and Cory were still together), Cory picked her up at her mother's trailer in his maroon Caprice automobile. Because he had been drinking, she drove. After driving around Decatur and discussing their plans for the day, they stopped at the house of Gary Wharton, another of her cousins and defendant's brother. They went inside and visited for a couple of hours. Defendant, Gary Wharton, and Amanda Russell were there. As she sat in another room with Amanda, Donna heard Cory ask defendant if he wanted to rob Cory's cousin, James Foreman. She did not hear defendant's reply.

Donna testified that she, defendant, and Cory left Gary Wharton's house in Cory's car: she in the driver's seat, Cory in the front, and defendant in the back. Cory made her drive. She felt she had no choice because he had beaten her in the past ("[b]asically[,] all the time") and would not hesitate to beat her again and now that she was pregnant with his child, she "[didn't] really feel like getting hit on." Defendant directed her to Franklin Small's house. On the way, Cory and defendant spoke further of robbing James, including where to park and how to ascertain whether he was home. They arrived at Franklin's house at 9 or 10 p.m. Defendant got out of the car and returned, 15 minutes later, with Franklin, who climbed into the backseat with defendant. All three of these men, Donna testified, were white.

From Franklin's, they went to Olympic Village. Donna testified they drove through the main entrance of Olympic Village and into a parking lot, looking for James's car. Cory, sitting beside her in the front, had a handgun. The three men agreed to a division of labor. Defendant said he would "get the [tele]phones." Cory said "he would go in and whoever was at the door[,] he'd hit them and he'd get the money." Franklin said he would "hold up the other people." All three had stocking caps that they could pull down over their faces—although she never actually saw them put the stocking caps on. Donna believed Franklin's cap was white and Cory's and defendant's caps were black, but she was unsure. Cory's cap had holes in it, like a ski mask, and defendant's cap "was like a Halloween mask."

Donna testified that when they found James Foreman's car, she parked on a dead-end road in a residential area and the three men got out, taking their stocking caps with them. Ten to fifteen minutes later, they came running back to Cory's car—Cory and Franklin first and, a moment later, defendant. Defendant remarked that "[t]here was a girl in there and that he told her to shut up." Cory returned with a fat wad of cash in his hands and said he had gotten it from James. Cory said "[h]e held the gun up to his head and Jimmy Foreman tried to hit him back with a baseball bat and he told him to get on the bed and give him the money." Donna drove them back to Gary Wharton's house. She saw "cell[ular] [tele]phones, pagers, [and] a walkie-talkie" in the car.

She testified that when the men got out of the car at Gary Wharton's house, she saw that all three of them, not just Cory, had handguns. The three split up the money that Cory had, taking $850 apiece. To her knowledge, Cory did not have the money prior to robbing James's apartment. She had been with him since 2 p.m. that day. The three men decided to throw the cellular telephones into the lake.

During direct and cross-examination, Donna admitted giving the police several false versions of the facts before finally telling them the truth. She testified Cory had coerced her to lie, threatening to beat her and to "take [defendant] down" with him if he went to prison. On December 1, 1999, when Cory dropped her off at the police station, she told Campbell what Cory had commanded her to say, *i.e.*, that she drove by James's apartment two or three times on November 28, 1999, but did not stop. Then she told Campbell that she and Cory went out to dinner on November 28 and she knew nothing of the robbery. On December 7, 1999, she falsely told Campbell that on November 28 she and Cory went to her aunt Nancy's house and before and after going there, passed by James's apartment but did not stop because his car was gone and there were no lights on. Then she told Campbell that she and Cory went to the house of a friend, Heather Hurt, and returned home at 12:30 a.m. on November 29. She testified that none of those stories was true.

Donna testified that on December 21, 1999, when she persisted in her earlier statements, the police arrested her for obstruction of justice and jailed her. In jail, she gave Campbell a written statement implicating Cory and herself in the robbery. At some point, she falsely told the police that Gary Fisher also had participated in the robbery. On January 3, 2000, she was released from jail, on bond, and two days later, went to Cory's lawyer's office, where—at Cory's urging—she signed a written statement that defendant alone was guilty of the robbery and Cory had nothing to do with it. On January 31, 2000, in a separate

trial, Donna admitted that the statement she had given Cory's lawyer "was full of lies."

She testified she had pleaded guilty to the charge of obstructing justice but had not yet been sentenced. In return for her "testify[ing] truthfully" in this case, the State had agreed not to oppose probation. Cory was out of jail on bond in January 2000, but Donna "had him put in jail sometime in February."

The State rested, and defendant moved for a directed verdict on all counts. "I have no argument on it other than [to] make that motion," defense counsel said. The trial court denied the motion, and defendant called his first witness, Tabbatha Hall, 17 years old. Tabbatha testified that Franklin Small had been her boyfriend for six months and "[a]t Thanksgiving time" in 1999 he lived with her at her mother's and stepfather's house. Because she used to jot everything down in a diary, she was confident that Franklin was "with [her] the whole day" on November 28, 1999. At 9:15 p.m. on November 28, Franklin was at his mother's house, and Tabbatha drove her mother's car there to pick him up. Crystal Ellis and Autumn Murrell rode along. From Franklin's mother's house, they went to pick up a friend named Jeremiah and proceeded to Hess Park, where they swung on the swings. They stayed at Hess Park only 10 to 15 minutes because Autumn paged her. At 10 or 10:15 p.m., Tabbatha went home to telephone Autumn, who requested that Tabbatha pick her up at the Subway restaurant. At 10:30 p.m., Tabbatha, Crystal, and she went to Subway, picked up Autumn, and returned to Tabbatha's house at 10:45 p.m. They visited there until midnight, whereupon Tabbatha returned the car to her mother at R.J.'s Bar and Grill. Franklin, Crystal, and someone named Mikey came along in Crystal's car. After leaving Tabbatha's mother's car at R.J.'s Bar and Grill, they returned to Tabbatha's house, in Crystal's car, and visited there a while longer. At 1 a.m. on November 29, Franklin, Autumn, and Crystal took Mikey home. Tabbatha remained at her house. At 1:30 a.m., after stopping at Steak and Shake, Franklin, Autumn, and Crystal returned to Tabbatha's house, where everyone went to bed.

Autumn Murrell, 16 years old, corroborated Tabbatha's testimony, except she did not testify to accompanying Tabbatha to Franklin's mother's house.

Crystal Ellis, 17 years old, described Franklin Small as 5 feet 6 or 7 inches tall, weighing "100 some pounds, kind of chubby a little," and having "dark hair and dark eyes." She thought he was 18 or 19 years old. She remembered what happened on November 28, 1999, because, like Tabbatha, she was a diarist. Her testimony agreed with Tabbatha's and Autumn's, and she added that from the time they

picked up Franklin at his mother's house until they went to bed at 1:40 a.m., Franklin was continuously in her presence. All three witnesses—Tabbatha, Autumn, and Crystal—testified they were acquainted with defendant and did not see him on November 28, 1999.

The defense next called Amanda Russell, 20 years old, who testified that she had been Gary Wharton's girlfriend for two years and had known defendant, Gary's brother, six or seven years. On November 28, 1999, Cory Zimmer and Donna Scott came to her house between 5:45 and 6 p.m. Although Gary lived with Amanda, he was not home, having stormed out after arguing with her. Only Amanda, Cory, and Donna were in the house. After lifting weights in Amanda's house for approximately 15 minutes, Cory said he had to go to Wal-Mart and left Donna with Amanda. When Cory returned, he and Donna left immediately because Amanda had to pick up defendant at his mother's house. (Defendant had no car, and Amanda often gave him rides.) At 7:35 or 7:40 p.m., Amanda picked defendant up, and the two went to Carlos O'Kelly's restaurant. Approximately 45 minutes later, she and defendant returned to her house, sat in the living room, and watched television. Amanda fell asleep at 9:30 or 10 p.m., and when she awoke at 2 or 3 a.m., defendant was asleep on the floor of the living room and Gary Wharton was asleep in the bedroom.

Patrick Campbell testified he was a Decatur police officer assigned to the detective bureau and his job was to investigate violent crimes. On December 7, 1999, James Foreman told him "he believed the subject who came to his bedroom was a black male because he could see darkness around the [eyeholes] of the mask and possibly on the neck he could see dark skin." James further told him there were two or possibly three intruders in the apartment and they wore masks. On December 15, 1999, he interviewed Tiffany McQueen and showed her two photographic lineups, including a photograph of defendant. Campbell described Cory Zimmer as a blonde-haired man 5 feet 10 inches to 6 feet tall, and weighing 180 pounds.

Defendant rested. After a conference on the instructions, defendant renewed his motion for a directed verdict, arguing, this time, that there was no evidence that defendant was not a police officer acting in the line of duty. The trial court denied the motion for a directed verdict.

During his closing argument, defense counsel argued that because Donna Scott had given the police different versions of the facts "depending on which way the wind was blowing," the jury should not believe her now. She had admitted falsely accusing Gary Fisher. Therefore, defense counsel argued, she was fully capable of falsely accusing defendant. If, according to the testimony of three witnesses,

Franklin Small was not present at the robbery, the jury could not believe Donna Scott's testimony that defendant was present, either. In short, the gravamen of defense counsel's argument was that Donna Scott was unbelievable and defendant was not one of the robbers.

The trial court instructed the jury that home invasion had the following four elements:

"First proposition, that the [d]efendant or one for whose conduct he is legally responsible was not a police officer acting in the line of duty, and[,] second proposition[,] that the [d]efendant or one for whose conduct he is legally responsible knowingly and without authority entered the dwelling place of another[,] and[,] third proposition, that when the [d]efendant or one for whose conduct he is legally responsible[ ] entered the dwelling place[,] he knew or had reason to know that one or more persons was present and[,] fourth proposition, that the [d]efendant or one for whose conduct he is legally responsible intentionally caused the injury to Darin Hill, a person within the dwelling place."

The trial court instructed the jury that armed robbery had the following three elements:

"First proposition, that the [d]efendant or one for whose conduct he is legally responsible knowingly took property from the person or presence of Darin Hill and James Foreman[,] and, second proposition, that the [d]efendant or one for whose conduct he is legally responsible did so by the use of force or by threatening the eminent [sic] use of force[,] and[,] third proposition, that the [d]efendant or one for whose conduct he is legally responsible, carried on or about his person a dangerous weapon or otherwise [was] armed with a dangerous weapon at the time of the taking."

The trial court instructed the jury that residential burglary had the following three elements:

"First proposition, that the [d]efendant or one for whose conduct he is legally responsible knowingly entered the dwelling place of another[,] and[,] second proposition, that the [d]efendant or one for whose conduct he is legally responsible did so without authority[,] and[,] third proposition, that the [d]efendant or one for whose conduct he is legally responsible did so with the intent to commit therein the offense of theft."

The trial court instructed the jury on accountability, as follows:

"A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense[,] he knowingly solicits, aids[,] abets, agrees to aid[,] or attempts to aid the other person in the planning or commission of an offense."

The trial court further instructed the jury:

"When a witness says he was involved in the commission of a crime with the [d]efendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

During deliberation, the jury gave the trial court a written request for the date of Donna Scott's statement to the police, a copy of Donna Scott's testimony, and a copy of Donna Scott's police testimony. After discussing the jury's request with counsel, the trial court replied in writing as follows:

"We cannot provide you with that material because we do not have the equipment to provide that information in a reasonable period of time. You will have to decide the case on the testimony you heard and saw and your recollection of the evidence."

On May 19, 2000, the second day of deliberation, the jury announced a verdict of not guilty on the count of home invasion and declared itself hung on the counts of armed robbery and residential burglary. The trial court entered judgment on the verdict of not guilty and declared a mistrial on the other two counts.

On July 3, 2000, defendant filed a motion to bar prosecution, arguing that because the jury had returned a verdict of not guilty on the charge of home invasion (count V), the doctrines of collateral estoppel and double jeopardy barred the State from prosecuting him again on the remaining charges (counts VI and VII).

On August 9, 2000, the trial court heard arguments on the motion. Defense counsel argued that, looking at the record realistically, the court should conclude that the jury disbelieved the following elements: (1) that defendant entered the apartment or (2) that defendant intentionally injured Darin Hill by striking him on the head with a gun. Like home invasion, residential robbery required an unauthorized entry, and, by the State's theory, the armed robbery occurred inside the apartment. Moreover, counts V and VI both required that defendant was armed with a gun, and no solid evidence showed that he was armed, defense counsel argued.

The trial court remarked that in count V of the charge (home invasion), the State alleged defendant "struck Darin Hill in the head with a gun." "[I]f I was a juror," the trial court said, "I [would have been] convinced he was hit in the head, but I don't think the evidence was real clear as to what he was hit with. *** I [would not be] convinced beyond a reasonable doubt he was hit with a gun." The trial court noted that the instruction on home invasion did not require that defendant hit Darin with a gun. The charge alleged he did so, however, and the court thought the jury might have "got hung up on"

that allegation in the charge. Defense counsel argued it was "a great leap \*\*\* to assume that [the jury] ignored instructions and tacked on an additional element of being hit in the head with a gun as opposed to something else."

The prosecutor argued that the count of home invasion had elements that were not in the other counts, namely, that (1) defendant was not a police officer acting in the line of duty and (2) defendant knew or had reason to know that someone was in the apartment when he entered it. The jury might have found one or both of those elements to be unproved, the prosecutor argued.

After hearing those arguments, the trial court denied the motion to bar prosecution. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

■ According to defendant, this appeal presents only questions of law and the standard of review is, therefore, *de novo*. The State does not disagree. We review questions of law *de novo*. *People v. Bramlett*, 329 Ill. App. 3d 286, 289, 767 N.E.2d 961, 964 (2002).

### B. Direct Estoppel

■ The Illinois Constitution says: "No person shall \*\*\* be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10. The fifth amendment to the federal constitution says: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb \*\*\*." U.S. Const., amend. V. Through the fourteenth amendment, the fifth amendment's guarantee against double jeopardy is enforceable against the states. *Benton v. Maryland*, 395 U.S. 784, 794, 23 L. Ed. 2d 707, 716, 89 S. Ct. 2056, 2062 (1969).

Collateral estoppel is a corollary to double jeopardy. *People v. Briddle*, 84 Ill. App. 3d 523, 527, 405 N.E.2d 1357, 1360 (1980); *Ashe v. Swenson*, 397 U.S. 436, 445-46, 25 L. Ed. 2d 469, 476-77, 90 S. Ct. 1189, 1195 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443, 25 L. Ed. 2d at 475, 90 S. Ct. at 1194. See 720 ILCS 5/3—4(b)(2) (West 2000). " '[I]f the record of the former trial shows that the verdict could not have been rendered without deciding the particular matter,' " the judgment on that verdict will collaterally estop the parties, in all future litigation, as to that matter. *People v. Ward*, 72 Ill. 2d 379, 383, 381 N.E.2d 256, 259 (1978), quoting *Hoffman v. Hoffman*, 330 Ill. 413, 417, 161 N.E. 723, 725-26 (1928). The defendant bears the burden of proving that

the jury necessarily determined the issue in the prior proceeding. *Dowling v. United States*, 493 U.S. 342, 350-51, 107 L. Ed. 2d 708, 719, 110 S. Ct. 668, 673 (1990).

■ We assume (to be precise) that defendant intends to invoke the doctrine of direct estoppel rather than collateral estoppel. A retrial is not collateral if it is a continuation of the first trial. *United States v. Bailin*, 977 F.2d 270, 276 (7th Cir. 1992). "Issue preclusion 'within the confines of a single claim or cause of action' is known as 'direct estoppel.' " *Bailin*, 977 F.2d at 276, quoting C. Wright, Federal Practice & Procedure § 4418, at 465 (1981); see also *People v. Daniels*, 187 Ill. 2d 301, 320 n.3, 718 N.E.2d 149, 161 n.3 (1999), *cert. denied*, 529 U.S. 1088, 146 L. Ed. 2d 644, 120 S. Ct. 1723 (2000). This difference in nomenclature has no practical effect because the same rules that apply to collateral estoppel also apply to direct estoppel. *Daniels*, 187 Ill. 2d at 320 n.3, 718 N.E.2d at 161 n.3.

■ When a jury returns a general verdict, it can be difficult to ascertain which facts the jury found to be unproved; the difficulty, however, is not insuperable. *Ward*, 72 Ill. 2d at 383, 381 N.E.2d at 259. The court must " 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 475-76, 90 S. Ct. at 1194, quoting D. Mayers & F. Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv. L. Rev. 1, 38-39 (1960). The court must look at the record rationally and realistically rather than in the hypertechnical manner of a "19th[-]century pleading book." *Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 476, 90 S. Ct. at 1194-95. The court may not find, for instance, that the jury " 'disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest.' " *Ashe*, 397 U.S. at 444 n.9, 25 L. Ed. 2d at 476 n.9, 90 S. Ct. at 1194-95 n.9, quoting 74 Harv. L. Rev. at 38. The court must set its inquiry "in a practical frame" (*Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 476, 90 S. Ct. at 1194) and assume that the jury did not reach its verdict through " 'mental gymnastics' " (*People v. Borchers*, 67 Ill. 2d 578, 589, 367 N.E.2d 955, 960 (1977), quoting *Johnson v. Estelle*, 506 F.2d 347, 352 (5th Cir. 1975)).

Defendant argues the jury acquitted him of home invasion because it had reasonable doubt he "was one of the men to unlawfully enter the dwelling of Darin Hill and James Foreman." Looking at the record realistically, we must decide "whether a rational jury could have grounded its verdict upon an issue other than" the issue of whether

defendant entered the apartment. *Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 475-76, 90 S. Ct. at 1194. In other words, could the jury have rationally concluded that any other element of home invasion, besides defendant's entry into the apartment, was unproved? To answer that question, we must assume, for the sake of argument, that the jury found that defendant was one of the intruders. Other elements of home invasion presuppose an unauthorized entry. It would make no sense to ask, for example, whether defendant knew or had reason to know that someone was in the apartment, unless we assumed that defendant entered the apartment.

The State argues the jury could have had reasonable doubt that (1) defendant knew Darin Hill and James Foreman were in the apartment when he entered it and (2) defendant intentionally injured Darin by hitting him in the head with a gun. It was unrebutted that the first intruder to enter the apartment struck Darin on the nose as Darin stood in the doorway of the apartment and that a loud commotion ensued as Darin ran back into the apartment, the intruder hit him on the back of the head, and Darin bumped into James's bedroom door. Defendant never disputed that testimony. Thus, it was clear that the intruders knew or had reason to know that someone was in the apartment when they entered. It was equally clear, under the instructions, that the other intruders would have been legally responsible for the first intruder's injury of Darin. To accept the State's argument, we would have to hold that the jury " 'disbelieved substantial and uncontradicted evidence of the prosecution on *** point[s] the defendant did not contest.' " *Ashe*, 397 U.S. at 444 n.9, 25 L. Ed. 2d at 476 n.9, 90 S. Ct. at 1194-95 n.9, quoting 74 Harv. L. Rev. at 38.

The jury could not have had reasonable doubt on the other elements of home invasion. It could not have deadlocked on the issue of whether defendant or someone for whose conduct he was legally responsible was a police officer acting in the line of duty. No evidence or argument showed that the perpetrators of this crime were police officers; nor would it be remotely reasonable to assume they were. The jury could not have reasonably doubted that defendant and the other intruders lacked authority to enter the apartment at 10 or 10:30 p.m. on November 28, 1999. Nor could it have reasonably doubted that an intruder hit Darin on the nose and the back of the head, intentionally injuring him, and that the other intruders were legally responsible for the assault. On the charge of home invasion, the "single rationally conceivable issue in dispute" was whether defendant entered the apartment. *Ashe*, 397 U.S. at 445, 25 L. Ed. 2d at 476, 90 S. Ct. at 1195.

Defendant never disputed that the intruder hit Darin with a gun

(as opposed to hitting him with some other object)—although, as the trial court said, the evidence was unclear on that point. According to the charge (as the trial court paraphrased it to the prospective jurors), defendant "struck Darin Hill in the head with a gun." *Ashe* says to " 'tak[e] into account' " the " 'charge.' " *Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 475, 90 S. Ct. at 1194, quoting 74 Harv. L. Rev. at 38-39. We must also take into account the instruction on home invasion, which did not require the jury to determine what the intruder hit Darin with. See *People v. Smith*, 259 Ill. App. 3d 492, 501, 631 N.E.2d 738, 744 (1994) (if the information charges all the essential elements of an offense, additional allegations therein are "mere surplusage"). The trial court instructed the jury: "The law that applies to this case is stated in these instructions[,] and it is your duty to follow all of them." In its instructions, the trial court specifically told the jury each element the State had to prove. It would be unreasonable to infer that the jury disregarded the clear instruction on home invasion (thereby violating its oath) and, on its own initiative, compiled a different list of elements for that offense from the statement of the case. We must assume the jury was "rational" (*Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 475, 90 S. Ct. at 1194), and a rational jury endeavors in good faith to do its sworn duty rather than deliberately subvert the administration of justice by disregarding clear instructions. "We must presume, absent a showing to the contrary, that the jury followed the trial court's instructions in reaching a verdict." *People v. Simms*, 192 Ill. 2d 348, 373, 736 N.E.2d 1092, 1112 (2000).

The jury must have had reasonable doubt that defendant was one of the intruders. No other explanation makes sense, because evidence of the other elements was overwhelming. The only evidence of defendant's participation in the robbery was Donna Scott's testimony, and the jury could have reasonably doubted her credibility. She had made a deal with the State. The trial court instructed the jury to regard with caution the testimony of anyone who participated in the crime. One may infer, from the jury's requesting a transcript of Donna's testimony as well as a copy of her statements to the police, that it was concerned about her inconsistencies and recantations.

One might argue that if the jury had reasonable doubt that defendant was one of the robbers, it surely would have acquitted him of the other charges, too. By the same token, if the jury had concluded that defendant was guilty of those charges, it would have returned a guilty verdict on them. The jury's lack of agreement on counts VI and VII signifies nothing, one way or the other. "The powerful double[-]jeopardy protections that attach to acquitted counts should not be outweighed by the inconclusiveness inherent in hung counts." *Bailin*,

977 F.2d at 280. The lack of a verdict on one count cannot nullify the preclusive effect of a verdict on another count.

■ An unauthorized entry into the apartment was an element that count V (home invasion) and count VII (residential burglary) shared. The acquittal on count V estops the State from contending that defendant entered the apartment. Therefore, the trial court erred in denying the motion to bar the reprosecution of defendant on count VII.

An unauthorized entry into the "dwelling place of another" is not one of the elements of armed robbery. Nevertheless, in a subsequent trial, the State would have to prove that defendant or someone for whose conduct he was legally responsible knowingly took property from the person or presence of Darin Hill and James Foreman. Because it is undisputed that Darin and James were robbed at gunpoint inside their apartment, it would be impossible to prove armed robbery without proving that defendant (or someone for whose conduct he was accountable) was one of the intruders. As a practical matter, defendant's entry into the apartment would be an "ultimate issue" in a retrial on armed burglary (see *Dowling*, 493 U.S. at 348, 107 L. Ed. 2d at 717, 110 S. Ct. at 672), although, technically, it would not be a legal element of armed robbery. The State could not prove that defendant robbed Darin and James without proving that he entered their apartment. In applying the doctrine of collateral estoppel, we will reject the approach of the "19th[-]century pleading book." *Ashe*, 397 U.S. at 444, 25 L. Ed. 2d at 475, 90 S. Ct. at 1194. We hold that the acquittal on the count of home invasion (count V) estops the State from reprosecuting defendant for armed robbery (count VI) as well as residential burglary (count VII).

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment as to the denial of defendant's motion to bar further prosecution on counts VI and VII.

Reversed.

COOK, J., concurs.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent. The jury's acquittal of defendant on home invasion should not bar retrial on armed robbery and residential burglary. Defendant was clearly charged with and the jury told of the charge of home invasion which caused injury to Hill by a strike from a

gun. The prosecution argued that "[d]uring the course of that scuffle[,] Mr. Hill was struck in the back of the head of [sic] what he believes to be a gun." Hill testified, "I was struck with an object. *** First[,] in the nose, then in the back of the head. *** I believe it was a gun." The prosecution argued in closing, "he was hit in the nose. He covered his nose after being struck during of [sic] course of which his hand was hit and then he was hit on the back of the head with what he believed to be a gun." Based upon this argument and evidence, the trial court correctly found that the jury could have been hung up on the allegation that Hill was hit with a gun. Moreover, as the majority notes, the charge of home invasion, which charged injury to Hill by the strike of a gun, is to be taken into account when deciding whether a rational jury could have grounded its verdict upon an issue other than those encompassed in the armed robbery and residential burglary charges. *Ashe*, 397 U.S. at 444, 25 L. Ed. at 475-76, 90 S. Ct. at 1194.

Finally, the jury could also question whether defendant was the intruder who actually struck Hill because the intruder wore a ski mask. Further, the jury may not have felt defendant was legally responsible for that first intruder's injury of Hill because no injury of the occupants was planned prior to entry. Residential burglary and armed robbery, on the other hand, require only unlawful entry with the intent to commit a theft and the taking of property by force while armed. A rational jury could have, therefore, grounded its not guilty verdict on an issue other than whether defendant entered the apartment, and defendant, therefore, should be retried on the residential burglary and armed robbery counts.

For these reasons, I would affirm the trial court.